1  MICHAEL TROY WILKES
   HANDICAPSKATER.com
2  2201 Bridgepointe Pkwy, C246
   Foster City, CA 94404
3  (650) 678-0502
4  HANDICAPSKATER@mindspring.com

5

6  MICHAEL TROY WILKES, PLAINTIFF IN PRO SE

7

8

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12  MICHAEL TROY WILKES,                    Case No.: CV25    6224

13                  Plaintiff,              **COMPLAINT FOR DAMAGES,**
                                            **INJUNCTIVE AND DECLARATORY**
14         vs.                              **RELIEF**

15  SAN MATEO COUNTY TRANSIT DISTRICT
16  (SAMTRANS), including REDIWHEELS AND
    CALTRAIN; BAY AREA RAPID TRANSIT
17  (BART); SAN MATEOCOUNTY EVENT
    CENTER; UNITED AIRLINES, INC.; DELTA
18  AIRLINES, INC.; AIRBNB, INC.; U.S. BANK;
    SAN MATEO COUNTY SUPERIOR COURT;
19  SAN MATEO POLICE DEPARTMENT;
20  CALIFORNIA DEPARTMENT OF MOTOR
    VEHICLES (DMV); and DOES 1-50,
21

22                  Defendant(s).

23

24                     **INTRODUCTION**

25  This motion is brought ex parte pursuant to Federal Rule of Civil Procedure 65(b), because Plaintiff

26  seeks urgent and immediate relief for a public event scheduled to occur on July 26, 2025 at the San

27  Mateo County Event Center. Delay would result in irreparable harm, including continued denial of

28

          **COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

access to public accommodations and further injury from inappropriate ParaTransit vehicles.
Defendants RediWheels and the San Mateo County Event Center have long been aware of
Plaintiff's disability and mobility device. Despite prior notices, these Defendants have failed to
accommodate Plaintiff. For Defendants United Airlines and Delta Airlines, Plaintiff seeks inclusion
in the order only as necessary to preserve Plaintiff's ability to fly on short notice due to potential
family emergencies.

1. This is a civil rights action under Title I, II, III, and V of the Americans with Disabilities Act
   (ADA), 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, California's Unruh
   Civil Rights Act (Cal. Civ. Code § 51 et seq.), and 42 U.S.C. § 1983 for denial of due process.
   Plaintiff Michael Troy Wilkes seeks injunctive and declaratory relief, as well as damages, due
   to systemic discrimination against his use of prosthetic inline skates as a mobility aid.

2. Plaintiff, who suffers from severe pelvic injuries and pain-induced cardiovascular events
   (PICE), uses skates as a medically necessary mobility prosthesis functionally equivalent to a
   common wheelchair, Exhibit P (HSK-SYS-0054—0055) and Exhibit R (HSK-SYS-0066—
   0068). Despite prior legal recognition and DMV certification, Plaintiff has been repeatedly
   denied access, accommodations, and employment, and was most recently denied access to his
   own Temporary Restraining Order (TRO) hearing by the San Mateo County Superior Court.

3. In 2007, the U.S. Department of Transportation – Federal Transit Administration (DOT-FTA)
   issued a Letter of Finding LOF, Exhibit A (HSK-SYS-0001—0008). in response to Plaintiff's
   formal ADA complaint, which acknowledged his disability and use of skates as a mobility
   aid. That letter affirmed that Plaintiff must be granted access to BART concourses and
   surrounding areas but allowed continued exclusion from trains and platforms based on a
   highly speculative and factually inaccurate "direct threat" rationale. Despite Plaintiff
   providing detailed biomechanical explanations of braking and propulsion (e.g., T-stop and
   confined-space ankle twist propulsion), the FTA and BART relied on unsupported
   assumptions about instability and space requirements. BART's Hardy Letter and Report
   reinforced this false safety narrative with generalized and outdated claims of hazard, while

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

1    ignoring Plaintiff's proven and documented capacity to safely navigate transportation spaces.

2    These unjustified exclusions persist to this day, over 20 years later.

3    4.  Plaintiff additionally possesses a 2003 video documenting CalTrain officials humiliating and

4    denying him access due to his mobility aid. Videos available on the HandicapSkater.com

5    Media page demonstrate Plaintiff's successful use of prosthetic skates on moving vehicles—

6    such as CalTrain, BART, and airport terminal shuttles—without disruption or danger. In

7    addition, Plaintiff rides a motorcycle and drives a car while using skates, as certified by the

8    DMV. These demonstrations confirm, consistent with Einstein's theory of relativity, that

9    movement within a uniformly moving vehicle is physically equivalent to movement on

10    stable ground, provided the vehicle is traveling at constant velocity in a non-accelerative and

11    level environment. Defendants' claims that skating presents a unique danger due to "lateral

12    propulsion" or "rearward braking" ignore fundamental principles of inertial reference frames

13    and are disproven by biomechanical evidence and video documentation. The 2007 Letter of

14    Finding (LOF), Exhibit A (HSK-SYS-0001—0008), the Wilkes Plan, Exhibit B (HSK-SYS-

15    0009—0011), and the Hardy Safety Report, Exhibit C (HSK-SYS-0012—0017) all

16    mischaracterize the physics and biomechanics of inline skating. The Legal Aid Society of

17    San Mateo attempted to obtain accommodations in 2004 (Exhibit D, HSK-SYS-0018), but

18    after receiving no resolution, Plaintiff was forced to initiate legal action. These events form

19    a continuous evidentiary foundation for the ongoing discrimination persisting through 2025.

20    These repeated violations are not isolated incidents but constitute a continuing violation

21    under federal law, tolling any applicable statute of limitations. The sustained pattern of

22    discrimination—particularly in light of federal recognition of Plaintiff's mobility aid—

23    demonstrates willful and knowing misconduct under both federal and state civil rights laws.

24    5.  As a direct result of being barred from BART and CalTrain with his medically necessary

25    mobility aid, Plaintiff began riding a motorcycle with skates in 2004-2005. Even at the DMV,

26    Plaintiff was harassed by security personnel who questioned his use of skates in the DMV

27    office. In 2022, the San Mateo Police Department (SMPD) filed an incident report alleging

28

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**
- 3 -

1    Plaintiff lacked control of his motorcycle, Exhibit E (HSK-SYS-0019), leading to a wrongful

2    DMV license suspension.

3    6.    After prevailing in administrative proceedings and litigation to secure his right to drive with

4         prosthetic skates, the California Department of Motor Vehicles issued a driver's license to

5         Plaintiff with Restriction 50, which states: "Customized restrictions on file-Contact DMV."

6         The record resides at the DMV, Exhibit F (HSK-SYS-0020). This language, while nominally

7         recognizing Plaintiff's accommodation, fails to clearly identify his use of skates as a medically

8         necessary mobility aid. The ambiguity of this restriction creates a risk of future discrimination,

9         misinterpretation by law enforcement, and denial of access when driving or presenting

10        identification outside of California or in unfamiliar jurisdictions.

11   7.    BART and SamTrans compounded this discrimination through their failed accommodation

12        attempts. For example, a 2007 email from SamTrans manager Bill Welch advised Plaintiff to

13        commute 2.5 hours each way using ParaTransit services, Exhibit G (HSK-SYS-0021), rather

14        than utilizing public transportation (e.g., BART, CalTrain).

15   8.    Emails from Jonathon Klein (FTA) and BART confirmed that ParaTransit was obligated to

16        operate during the same hours as the fixed-route service. However, Plaintiff was denied rides

17        after 11:15 p.m. despite needing access until 12:15 a.m. for physical therapy, a 12-mile Friday

18        Night Skate around San Francisco. These violations were later corrected by Jonathon Kelin

19        and acknowledged by BART manager Susan Gallagher, who admitted fault issuing temporary

20        ParaTransit accommodations, Exhibit H (HSK-SYS-0022—0023).

21   9.    Plaintiff's website (HandicapSkater.com Media section) and correspondence with FTA

22        officials in 2007, including David Knight, Esq., demonstrate that Plaintiff provided video

23        proof of safely using skates on BART, CalTrain, and through airports, Exhibit I (HSK-SYS-

24        0024). These videos rebut the direct threat argument used to justify the denial of access. The

25        continued reliance on that false premise by FTA and BART—despite physical proof and

26        decades of evidence—demonstrates institutional failure and liability. The 2007 Letter of

27        Finding (FTA Complaint No. 06-0135, issued Oct. 15, 2007) explicitly accepted the use of

28        skates in BART concourses and acknowledged the legitimacy of Plaintiff's mobility aid but

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

failed to extend that logic to platform or train access—thus permitting a flawed "direct threat" doctrine to continue inappropriately.

10. Among the most egregious ongoing violations is Plaintiff's treatment by RediWheels ParaTransit. Despite his explicit and medically justified request for sedan transport due to the destructive effect of cutaway buses on his sacroiliac joints, RediWheels has repeatedly provided unsafe and painful transportation via rough-riding cutaway buses, further aggravating Plaintiff's condition. These include:

- 7/11/25 – 7:45 pickup called and told they were making a pickup in Daly City and would need 20 minute window.

   8:07 call back while waiting outside told 8:15 and that the drivers have been late all day.

   8:20 pickup cutaway bus 35 minutes late outside their window, bumpy as hell.

   Stops to get directions claiming the map is taking him to Geary Street dispatch says shared ride to pickup before my dropoff.

   At pickup notifies dispatch does not see client. Then has to secure client in wheelchair, but not level so had to move bus.

   It appears obvious they are picking this client up to be on time, while making me even later. Arrive in pain going over rough as hell road in cutaway bus @ 9:22. 22 minutes after my scheduled physical therapy appointment.

- 4/12/25: Pickup 30 minutes late after midnight, I call to find out and no one is there; it is after hours, required Plaintiff to order a Lyft that was never reimbursed.

- 2/14/25: Left waiting outside in 49°F temperatures with conflicting driver info and an eventual bumpy ride.

- 1/10/25, 1/3/25, 12/31/24, 12/27/24, and others: Repeated use of cutaway buses despite request for reasonable alternative, causing repeated physical harm.

These instances reflect an entrenched failure to provide effective accommodation and a deliberate indifference to Plaintiff's established needs. They further support the claim of systemic and ongoing ADA Title II violations.

11. Plaintiff will continue supplementing this record with additional documentation and video evidence found on HandicapSkater.com of these patterns of exclusion, degradation, and systemic failure to accommodate.

## JURISDICTION

12. Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1343, as this action arises under federal statutes including the ADA and U.S. Constitution. Supplemental jurisdiction over state law claims is invoked under 28 U.S.C. § 1367.

13. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in San Mateo, and San Francisco Counties, of California.

## PARTIES

14. Plaintiff Michael Troy Wilkes resides in San Mateo County, California.

15. Defendant SamTrans operates RediWheels, a complementary ParaTransit serviced that has repeatedly failed to provide reasonable accommodations for Plaintiff's mobility disability. Defendant BART and CalTrain, in conjunction with SamTrans and under oversight of the U.S. DOT-FTA, have engaged in Systemic Discrimination and denial of transportation access over a period of 20 years, violating the ADA and Section 504.

16. Defendants San Mateo Police Department (SMPD) and California DMV are public entities subject to ADA Title II.

17. Defendant San Mateo County Superior Court is a public entity subject to ADA Title II.

18. Defendant San Mateo County Event Center operates a place of public accommodation under ADA Title III.

19. Defendants United Airlines and Delta Airlines are private entities operating public accommodations under ADA Title III and subject to the Air Carrier Access Act (ACAA).

20. Defendants EverythingD/Accenture/AirBnB, Inc. and US Bank are private employers subject to ADA Title I.

1    21. Plaintiff is unaware of the true names and capacities of Defendants DOES 1-50 and will amend
2        this complaint when they are known.

3

4                                **FACTUAL ALLEGATIONS**

5    Prior Legal Precedents Supporting Mobility Aid Recognition

6      • *Wilkes v. BART* (Department of Fair Employment and Housing Ruling, 2006, Exhibit J (HSK-SYS-
7        0069))

8      • *San Mateo County Transit Police v. Wilkes,* No. 428023 (San Mateo Superior Court Sep. 28,
9        2005) (*Discrimination of HandicapSkater Accessibility*) [Available online at:
10        https://handicapskater.com/common/doc/HandicapSkater-Pleading.pdf]

11      • *Wilkes v. AirBnB/EverythingD/Accenture* (DFEH, 2021) [Available online at:
12        https://handicapskater.com/common/DFEH%20-%20AirBnB%20Summary.html]

13      • Wilkes v. BART (US DOT-FTA Letter of Finding, 2007) [Available as Ruling online at:
14        https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/bay-area-rapid-transit-
15        district-san-francisco-ca-10-15-07] [Actual Letter Addressed To Plaintiff Exhibit A (HSK-
16        SYS-0001—0008)]

17      • *CA DMV Driver Safety v. Wilkes,* DL No. *****242 (DMV Licensing and Operations
18        Division May 23, 2022) (*HandicapSkater Driving Accommodation*)
19        [Available online at: https://handicapskater.com/common/doc/HandicapSkater-Driving-
20        Accommodation-Pleading.pdf]

21

22    ADA Title I – Employment Discrimination

23    22. In 2020, AirBnB removed Plaintiff from an on-site job location after successfully working
24        with his prosthesis for two weeks. Plaintiff reported a safety hazard on the company Slack
25        channel after a dog tried to bite him. Accenture called the Plaintiff reporting that AirBnB
26        requested him to work from home indicating his prosthesis was a safety hazard. The Defendant
27        filed a California DFEH complaint, and they failed to conduct a due diligence investigation

28

                **COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

[Available    online    at:    https://handicapskater.com/common/DFEH%20-%20AirBnB%20Summary.html]. EEOC failed to follow through on scheduled intake.

23. In January 2022, US Bank extended Plaintiff's contract thru December 2022. US Bank requested the Plaintiff perform a Change Management Procedure task on Saturday April XX from 9pm – 12am conflicting with a pre-planned physical therapy appointment. The Defendant stated reason for dismissal (offshoring) was pretextual.

24. In 2005–2006, Plaintiff began releasing job sites from liability to demonstrate that his prosthetic mobility aid—inline skates—posed no safety risk and could be reasonably accommodated under the ADA. These early actions led to seamless access at multiple employment locations. In 2012, during a mandatory state unemployment training, Plaintiff was initially denied access by JobTrain due to his prosthesis. After Plaintiff explained the medical necessity and safety of his mobility aid, site manager Eric Forgaard apologized for the misunderstanding and allowed participation, Exhibit O (HSK-SYS-0053). Notably, after losing two jobs in 1997 as a result of repeated accessibility denials, Plaintiff developed a medically supported, biomechanics-informed protocol that would later form the basis for the **Wilkes Plan**—a structured proposal recognized by the U.S. Department of Transportation – Federal Transit Administration (DOT–FTA) in its 2007 investigation and Letter of Finding, Exhibit P (HSK-SYS-0055). This protocol integrated clinical support, biomechanical analysis, and liability waivers, offering agencies and employers a compliant, low-risk path to honoring ADA obligations for non-traditional prosthetic devices.

ADA Title II – Government Discrimination

25. In 2004, Plaintiff was denied access to public transportation due to use of skates as a mobility aid. A 2007 Department of Transportation (DOT-FTA) ruling, Exhibit A (HSK-SYS-0001—0008), granted Plaintiff ParaTransit access recognizing skates as a reasonable accommodation. However, they viewed skates as a toy and not as the biomechanical aid to make the Plaintiff whole.

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**
- 8 -

26. In 2023, a San Mateo deputy harassed Plaintiff at the courthouse entrance due to his skates, despite existing legal recognition of their medical necessity going back to 2005, Exhibit K (HSK-SYS-0025—0026). The Plaintiff was at the courthouse handling the 888 San Mateo Housing collections case.

27. In 2025, the San Mateo County Superior Court denied Plaintiff access to his own TRO hearing, forcing him to communicate through a bailiff while he remained outside the courtroom, Exhibit M (HSK-SYS-0000—0000). This violated Plaintiff's due process rights and ADA Title II. The Judge denied Plaintiff's last chance since before 2022 to attend the San Mateo County Fair for the weekend entertainment, after they letting him initially without an incident.

ADA Title III – Public Accommodation Denials

28. In 2025, Plaintiff was initially allowed into the San Mateo County Fair at the San Mateo County Event Center, then told he would not be allowed to return on future days despite successfully perusing the event (https://www.youtube.com/watch?v=EijkC5dXRj0&t=2s). In 2022, a similar event occurred where the police were called on him for using his prosthesis, and his cane was confiscated. The SMPD refused the bodycam footage in Exhibit L (HSK-SYS-0027—0028). In 2014, the Plaintiff was at the yearly San Mateo County Fair, where a vendor discriminated against him and the San Mateo Event Center wrote a note on their letterhead explaining they were in compliance, Exhibit M (HSK-SYS-0036).

29. Plaintiff has been repeatedly denied access to air travel due to his use of medically necessary prosthetic inline skates, most recently by United Airlines (2025), which refused during extensive recorded phone conversations and transcripts, Exhibit Q (HSK-SYS-0056—0065). This caused Plaintiff to miss significant family and social milestones, including visits with his aging parents and opportunities to meet his brother's children's spouses, and their children for the first time. In a prior instance, Delta Airlines allowed Plaintiff to fly but attempted to coerce documentation under duress, confronting him in a manner inconsistent with the Air Carrier Access Act. Despite this, Plaintiff was ultimately able to attend his high school reunion and

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

1    briefly reunite with family members. These incidents reflect ongoing, systemic violations of

2    the Air Carrier Access Act (49 U.S.C. § 41705), which prohibits discrimination against

3    individuals with disabilities in air travel.

4

5    ADA Title V Retaliation

6    30. Defendants have acted with retaliatory intent by enforcing inconsistent, discriminatory

7    policies and requiring Plaintiff to repeatedly request accommodation despite known medical

8    necessity and legal precedent.

9

10    **CIVIL DISOBEDIENCE TO ENFORCE DISABILITY RIGHTS**

11    Plaintiff has on multiple occasions over the past two decades, had to engage in peaceful Civil

12    Disobedience to enforce his disability rights after exhausting all conventional channels. These actions

13    were necessary to establish recognition of his prosthetic inline skates as a mobility aid and to

14    challenge systemic institutional refusals to accommodate his disability:

15    31. In 2005, Plaintiff boarded CalTrain while using his prosthetic skates to initiate a test case

16    under California Penal Code § 640(b)(10). Though the case was dismissed in the interests of

17    justice, Plaintiff was still denied future access. Hence, the reason he started riding a

18    motorcycle with skates to "get to work to make money to pay taxes, so the government can

19    discriminate against denying access to public transportation with his mobility aid". He

20    repeated the act in San Francisco obtaining a second reasonable accommodation in San

21    Francisco Traffic Court.

22    32. In or around 2012, Plaintiff refused to vacate his residence at Chesapeake Point after being

23    served a 30-day notice to leave despite his disability. Process servers were sent repeatedly,

24    adding to stress and instability, including re-modeling taking place at 8am above his

25    apartment. This led to the Defendant developing hypothyroidism and forgetting to file taxes

26    during that time losing out on a ~$10,000 refund. In court we reached a resolution via court

27    negotiation.

28

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

33. In 2020, Plaintiff left employment at AirBnB in protest. The employer had relegated him to remote work without accommodations (e.g., lack of Zoom, dialect comprehension issues, exclusion from meetings). These conditions, unaddressed despite disability disclosure, forced his exit via Civil Disobedience. The DFEH case was dismissed and the EEOC missed the phone appointment with the Defendant.

34. In 2022, Plaintiff was threatened by Officer Julio Jolivette of the San Mateo Police Department after being stopped while riding his motorcycle with skates. The officer interrogated Plaintiff about gear shifting, stated he was recording the encounter, then submitted a report leading to a 3-month license suspension by the DMV. Despite requesting the bodycam footage, Plaintiff was denied access. With no legal assistance available, Plaintiff engaged in further Civil Disobedience by:

    - Repeatedly practicing the DMV lollipop motorcycle course in Redwood City to pass it.
    - Renting and operating a car while his license was suspended to demonstrate safe driving with skates.

As a result of these efforts, Plaintiff is now certified by the California DMV to drive a car and ride motorcycle with skates as a prosthetic mobility aid—the only known case of its kind.

These acts underscore Plaintiff's sustained resistance to Systemic Discrimination and the extreme lengths he has had to endure to obtain the most basic Civil Rights afforded to others under the ADA and related laws.

## VI. SYSTEMIC DISCRIMINATION PATTERN AND CONTINUING VIOLATION DOCTRINE

The incidents Plaintiff describes are not isolated or unique. They illustrate a persistent failure by public and private institutions to recognize prosthetic mobility aids like inline skates as medically necessary accommodations. Across employment, transit, housing, and public access domains, the

1  pattern of denial, ridicule, or excessive burden placed on the Plaintiff shows a systemic lack of
2  compliance with ADA standards. Although Plaintiff is not currently seeking class certification under
3  Rule 23, the pervasive and repeat nature of Defendants' conduct demonstrates a pattern that may
4  impact other individuals with rare or misunderstood disabilities. The systemic failure to accommodate
5  prosthetic skates as a mobility aid—despite medical necessity, prior rulings, and clear
6  documentation—justifies broader federal oversight and permanent injunctive relief. Item C in
7  PRAYER FOR RELIEF is a solution in accordance with similar certifications the Plaintiff has
8  endured:

9    • ParaTransit demand to pass their "disability obstacle course" to gain access, when everyone
10       else has to fail it to gain access, Exhibit N (HSK-SYS-0050).

11    • DMV certification by passing the motorcycle lollipop course and passing the car driving test
12       both using prosthetic inline skates (https://rumble.com/v15qjar-lollipop-practice-4-eye-
13       view.html).

14

15  Continuing Violation Doctrine and Tolling

16  Plaintiff respectfully asserts that the doctrine of continuing violation applies here, as the
17  discriminatory acts are not isolated but part of a longstanding pattern extending from the 2003
18  CalTrain denial through the 2007 FTA LOF and up to the present-day ParaTransit and air travel
19  denials. Courts have applied equitable tolling in ADA and Civil Rights cases where the discriminatory
20  conduct persisted, or the defendant remained on notice of the violation but failed to correct it. This
21  systemic failure across multiple sectors justifies the Court's intervention not only to redress past
22  harms, but to enjoin future violations, set precedent for rare disabilities, and ensure uniform
23  enforcement of Civil Rights.

24

25                              **CLAIMS FOR RELIEF**

26  **Claim I: Disability Discrimination - ADA Title I (42 U.S.C. § 12112)**

27    35. Defendants EverythingD/Accenture/AirBnB and US Bank discriminated against Plaintiff in
28       employment decisions due to his disability and required therapy accommodations.

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

1

2  **Claim II: Public Services Discrimination - ADA Title II (42 U.S.C. §§ 12132-12133; 29 U.S.C. §**

3  **794)**

4  36. Defendants San Mateo County Transit District (SamTrans) and its RediWheels ParaTransit

5  service have failed to provide reasonable accommodations by repeatedly assigning Plaintiff

6  to cutaway buses, despite knowledge that such vehicles exacerbate his sacroiliac injuries. This

7  refusal is prolonged, painful rides that are neither medically safe nor functionally equivalent

8  to the transportation provided to nondisabled persons.

9  37. Defendants Bay Area Rapid Transit (BART) and CalTrain have, since at least 2003, refused

10  Plaintiff access to their fixed-route transportation systems on the basis of his disability and

11  choice of mobility aid. These denials continue despite the 2007 ruling by the U.S. Department

12  of Transportation—Federal Transit Administration (FTA) which acknowledged prior

13  discrimination but failed to mandate meaningful long-term compliance.

14  38. The U.S. DOT-FTA, as the federal regulatory body overseeing public transit access and as a

15  funder under Section 504, has enabled these ongoing violations by accepting outdated and

16  medically unsound safety standards, and failing to enforce the evolving understanding of

17  prosthetic mobility aids like skates.

18  39. These actions collectively violate 42 U.S.C. § 12132, which prohibits the denial of

19  participation in or the benefits of services, programs, or activities of a public entity, and 29

20  U.S.C. §794, which prohibits discrimination by entities receiving federal financial assistance.

21  40. Plaintiff seeks declaratory and injunctive relief to compel the provision of medically safe and

22  timely transit accommodations, including access to fixed-route systems and sedan-based

23  ParaTransit service. Plaintiff also seeks damages for the pain, humiliation, and isolation

24  caused by these prolonged and systemic violations.

25  41. Defendant San Mateo County Superior Court excluded Plaintiff from court access on the basis

26  of disability denying reasonable modification of policies, practices, or procedures. Despite

27  2005 ruling and reasonable accommodation for Defendant's prosthesis. There is an ongoing

28  case with negotiations, but the systemic denial forced elevation to federal level.

1

**Claim III: Public Accommodation - ADA Title III (42 U.S.C. § 12182; 42 U.S.C. § 12188)**

42. Defendants San Mateo County Event Center and United/Delta Airlines denied Plaintiff access to places of public accommodation on the basis of his disability.

**Claim IV: Retaliation – ADA Title V (42 U.S.C. § 12203)**

43. All Defendants retaliated against Plaintiff for asserting ADA rights by creating administrative burdens, denying repeated accommodations, or denying access outright.

**Claim V: Violation of Due Process – Civil Rights Act (42 U.S.C. § 1983)**

44. Defendant San Mateo County Superior Court violated Plaintiff's constitutional right to due process by denying access to his TRO hearing and refusing to allow Plaintiff into the courtroom based on his prosthetic device.

**Claim VI: Housing Discrimination - Fair Housing Act (42 U.S.C. § 3604(f), § 3617)**

45. The Fair Housing Act (FHA), 42 U.S.C. § 3604(f), prohibits housing providers from refusing to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with disabilities equal opportunity to use and enjoy a dwelling.

46. Plaintiff is a person with a disability under the FHA. Plaintiff suffers from a severe pelvic injury and pain-induced cardiovascular condition that requires use of prosthetic inline skates as a medically necessary mobility aid. These skates are functionally equivalent to a wheelchair and have been previously recognized by state and federal agencies as a legitimate reasonable accommodation.

47. At Chesapeake Pointe, Plaintiff was served with a 30-day notice to vacate the premises after asserting disability-related needs. Plaintiff contested the eviction in court and reached an agreement for a longer 90-day move-out period. During the proceedings, Plaintiff was publicly shamed by the presiding judge for being present in the courtroom wearing skates,

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**
- 14 -

despite medical and legal documentation validating them as a mobility aid. This constitutes discriminatory judicial treatment in connection with housing.

48. At 888 San Mateo, Plaintiff repeatedly requested reasonable accommodation for his disability: the use of prosthetic inline skates as a mobility aid, and a 90-day notice period for any rent increase, given the time required to secure accessible housing. The original property manager, Ryan, was informed of Plaintiff's disability needs upon move-in. However, after change in property ownership, the new management refused to recognize Plaintiff's mobility aid and consistently denied the 90-day notice request for over two years. Despite having the only designated handicap parking space in a separate garage for his two motorcycles with disabled plates, a new principal openly stated that she did not accept Plaintiff's skates as a mobility aid. Plaintiff was forced to resort to Civil Disobedience—leaving with email notice that was not recognized during initial pandemic chaos. In retaliation, the landlord imposed additional charges and initiated a baseless collection action through I.Q. Data International Case 22-CLJ-03788. Though the case was dismissed without prejudice, the experience inflicted significant hardship, humiliation, and financial strain.

49. Both instances reflect unlawful discrimination based on disability, including:

- Refusal to make reasonable accommodations as required by 42 U.S.C. § 3604(f)(3)(B),

- Retaliation for asserting disability rights under § 3617,

- Interference with Plaintiff's ability to use and enjoy a dwelling on equal terms with non-disabled tenants.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

A. Issue a declaratory judgement that Defendants violated Plaintiff's rights under the Americans with Disabilities Act (ADA), the Fair Housing Act, the Air Carrier Access Act, and the U.S. Constitution;

B. Grant a permanent injunction allowing Plaintiff unrestricted access to all public and private facilities using his medically necessary prosthetic inline skates;

C. Direct the California Department of Vehicles (or appropriate agencies) to implement a visible and standardized notation or moniker on Plaintiff's driver's license identifying his use of prosthetic skates for ambulating and driving, in place of vague administrative codes such as "Restriction 50-Contact DMV," to ensure proper recognition of his mobility aid across jurisdictions and eliminate the risk of further discrimination or misunderstanding;

D. Award compensatory and punitive damages against Defendants where applicable and permitted by law;

E. Award Plaintiff the costs of suit and reasonable attorney's fees under 42 U.S.C. § 12205 and other applicable statutes;

F. Grant such other and further relief as the Court deems just and proper.

DATED: July 24, 2025

Respectfully submitted,

/s/ Troy Wilkes
Michael Troy Wilkes
Plaintiff In Pro Se

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

EXHIBIT A (HSK-SYS-0001—0008)

**U.S. Department of Transportation – Federal Transit Administration (FTA) Letter of Finding, Complaint No. 06-0135 (Oct. 15, 2007)**

Letter of Finding issued by the FTA Office of Civil Rights concluding its investigation into Plaintiff's complaint against the Bay Area Rapid Transit District (BART). The FTA upheld BART's denial of access to vehicles and platforms on the basis of alleged "direct threat" posed by Plaintiff's use of prosthetic inline skates. The justification relied on two inaccurate assumptions: (1) that skating requires several feet of horizontal propulsion space, and (2) that braking on skates requires the user to tilt backward, increasing the risk of instability or injury. Plaintiff refutes both assertions with biomechanical evidence, video documentation of safe operation, and a history of accepted use on BART, CalTrain, and airport concourses. This document anchors the start of systemic discrimination legitimized by federal standards and justifies tolling the statute of limitations under the continuing violation doctrine.



U.S. Department
of Transportation
**Federal Transit
Administration**

Headquarters

East Building, 5th Floor – TCR
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

October 15, 2007

Troy Wilkes
338 South Fremont St., #221
San Mateo, CA  94401

Re:  FTA Complaint No. 06-0135

Dear Mr. Wilkes:

This letter responds to your complaint against the San Francisco Bay Area Rapid Transit District
(BART) alleging violations of Title II of the Americans with Disabilities Act of 1990 (ADA) and
the U.S. Department of Transportation's (DOT) implementing regulations at 49 CFR parts 27,
37, and 38.  The Federal Transit Administration (FTA) Office of Civil Rights is responsible for
civil rights compliance and monitoring, which includes ensuring that providers of public
transportation properly implement the ADA, the DOT ADA regulations, and Section 504 of the
Rehabilitation Act of 1973.

In the FTA complaint investigation process, we analyze the complainant's allegations for
possible ADA deficiencies by the transit provider.  If FTA identifies what may be a violation, we
first attempt to provide technical assistance to assist the public transit provider in complying
with the ADA.  If FTA cannot resolve apparent violations of the ADA or the DOT ADA
regulations by voluntary means, formal enforcement proceedings may be initiated against the
public transit provider which may result in the termination of Federal funds.  FTA also may refer
the matter to the U.S. Department of Justice for enforcement.

Each response is developed based on the specific facts and circumstances at issue.  A
determination resulting from a review of these facts is not intended to express an opinion as to
the overall ADA compliance of that transit property.

Specifically, your complaint of February 16, 2006, alleges that BART unlawfully denied you
access to BART facilities and vehicles as a result of your use of roller skates, which you state
you use as a mobility aid for a disability.[1]

FTA investigated your allegation and sent an information request to BART.  We received a
response from BART that provided relevant information, as well as several follow-up letters,

---

[1] More specifically, you use in-line skates, a type of skate.  Our previous correspondence refers to them as "roller
skates."  For consistency, we will continue using "roller skates" in place of "in-line skates" or "Rollerblades."

phone calls, and emails clarifying BART's initial response. In addition, you have supplemented your initial complaint with several letters, phone calls, and emails that clarified many issues related to your complaint. Your allegation is addressed in detail below.

### A. Relevant Issues

The primary issue on which you and BART disagree is whether your use of roller skates on BART vehicles and in BART facilities constitutes a direct threat[2]. Notably, there are other related issues, including whether roller skates can be considered a mobility aid, whether accommodation of your disability by allowing use of roller skates constitutes a fundamental alteration of service, and whether you are person with a disability under Federal law. Neither of the parties have conclusively addressed these additional issues. Accordingly, FTA will address the direct threat and reasonable modification issues as if the other issues were decided in your favor, but allow BART to raise them separately if it chooses.

BART has raised arguments that California state law prohibitions of roller skates in transit facilities overrides the requirements under Federal law that transit providers reasonably modify service to permit access by people with disabilities. BART points to exceptions under the relevant Federal regulations that allow a transit provider to exclude individuals with disabilities for illegal conduct and the absence of an explicit statement regarding Federal law supremacy in the DOT regulations at 49 CFR part 37. FTA has responded to BART's contentions by means of direct conversation with members of BART's staff. In summary, we have pointed to general principles of Federal law supremacy, the explicit statement of Federal law supremacy in 49 CFR § 27.17, and the inconsistency of BART's argument with basic principles and objectives of the Rehabilitation Act and the ADA. We note that BART's arguments for denying roller skate access focuses on issues of reasonable modification and direct threat, not Federal and state law supremacy.

BART has also argued that there is no need to provide a reasonable modification, following the logic adopted by the U.S. Court of Appeals for the 5th Circuit in Melton v. Dallas Area Rapid Transit, 391 F.3d 669 (5th Cir. 2004). The Melton court held that there is no requirement under DOT regulations to provide a reasonable modification in transit service because paratransit service is the statutorily determined reasonable modification for transit. Additionally, the court held that the Department of Justice (DOJ) requirements to modify service are not applicable to transit. The court's logic is at odds with the position of DOT and not controlling over the present question of BART's obligations to you in matters wholly occurring in California, under jurisdiction of the 9th Circuit Court of Appeals.

### B. BART's Obligation to Make Reasonable Modifications of Service

BART, as a transit provider, may implement generally applicable rules and regulations, even where those rules and regulations have the effect of limiting service to people with disabilities. Transit providers must, however, make reasonable modifications to such rules and regulations in order to provide access to people with disabilities who would otherwise be denied access because of their disabilities.

---

[2] DOJ defines direct threat as a significant risk to the health or safety of others that cannot be eliminated by a modification to policies, practices, or procedures, or by the provision of auxiliary aids or devices. 28 CFR § 36.208.

HSK-SYS-0002

Although the requirement for public entities to make reasonable modifications in their policies and practices is not explicitly addressed in the DOT ADA regulations, it is included in DOJ regulations, which are incorporated by reference at 49 CFR § 37.21(c). The relevant DOJ regulation states: "A public entity shall make reasonable modification in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability...." 28 CFR § 35.130(b)(7).

If making the modification creates a direct threat to others, however, the modification does not need to be made by the transit provider. In such cases, the transit provider must demonstrate the existence of the direct threat by fully considering all required factors, sufficiently deliberating, and making a clear fact-based decision regarding the need to make a modification in the particular circumstance. The conclusion that a given modification of service would create a direct threat may not be speculative, conclusory, discriminatory, or based on unlikely factual scenarios. The DOJ definition of direct threat dictates that only dangers to others, and not dangers to the person requesting the modification, be considered.

Based on correspondence with BART and publicly available information concerning BART stations and vehicles, there appear to be four distinct environments encountered by patrons of BART service:

1. BART rapid rail vehicle passenger areas.
2. BART platform areas from which patrons board onto or alight from BART vehicles.
3. BART concourse areas, either below or above the platform, which BART patrons enter from the street or adjoining facilities and which BART patrons must pass through in order to reach the platform. These areas are at least partially sheltered and include fare payment machines, customer service, turnstiles, and elevators and/or escalator access to the platform.
4. BART parking lots, bus areas, outside walkways, and other outside areas adjoining BART stations, which patrons must pass through in order to reach the station concourse.

Our analysis addresses each of the four distinct environments individually because of the different safety concerns present in each. A premise of our analysis is that incompatibility of roller skate use in one of the environments, because of direct threat, does not necessarily mean that roller skate use will be incompatible with the other areas. Additionally, for each of the environments, we consider whether changes in the typical number of patrons that occur throughout the service day will create or mitigate the level of danger from use of roller skates in that area.

In the documentation in support of allowing access to all areas within BART facilities, you note your ability to use roller skates in a particularly safe manner. We have no reason to doubt your description of your ability; however, we must address this issue in terms of the class of mobility aid users. Consequently, our analysis is based on the performance expected of a competent roller skate user with a disability, not one of your atypical abilities.

1. **BART has demonstrated that use of roller skates as a mobility aid on BART vehicles creates a direct threat.**

3

BART uses rapid rail vehicles that are joined together to form a train of vehicles several hundred feet long. Individual vehicles do not, typically, have operators or other BART personnel on board, but are instead operated by a single operator in the lead car who is responsible for the entire train. The nature of rail service means that the vehicles may leave the station before every passenger has a chance to find a seat.

Typically, the danger to most riders from moving unexpectedly is mitigated by the presence of grab bars throughout each vehicle. Notably, it is not clear that you are proposing to sit on BART vehicles, which may be incompatible with your disability. In any case, every rider on a BART vehicle can reasonably expect to stand at some point while riding[3]. The grab bars on BART vehicles are designed, however, for use by riders while standing directly on the vehicle floor or sitting in a secured mobility aid, not for riders standing in roller skates.

When arriving at stations, BART vehicles decelerate rapidly and when leaving the stations, accelerate rapidly. According to BART, trains typically enter the stations at 36 mph before coming to a stop within the length of the platform. The vehicles travel at rapid speed between stations, but often decelerate or accelerate because of other trains on the track, the need to change tracks, maintenance work, hazards on the tracks, and for other reasons. There are no warnings before most sudden changes in speed. As any rider of rapid rail vehicles has experienced, each time the vehicle decelerates and accelerates passengers are subjected to strong forces in the opposite direction. Such forces are likely to cause a roller skate user to fall. Roller skate users are more likely to fall than other patrons because they cannot use traction with the vehicle floor for stability.

Unlike wheelchairs and Segways, roller skates cannot be mechanically secured. Roller skates require the user to apply a brake by tilting a foot backward and shifting weight to compensate. The in-line skate user must apply constant force on the brake-side in-line skate in order to prevent movement, which requires careful balance. Alternative methods of braking (such as T-stopping) require similar balancing and are less effective. Unlike a Segway or wheelchair, the user must maintain constant balance while standing. Gripping a bar or seat will not prevent the roller skater's feet from moving, and may even increase risk of falling onto or into other passengers. In summary, maintaining balance is difficult because the roller skate user is standing on wheels. By contrast, walkers, Segways, wheelchairs, and other more common mobility aids have tremendous stability, low centers of gravity, and securable wheels.

Additionally, the passenger areas of rapid rail vehicles of the type used by BART have many tripping hazards. The vehicles are very different from large open floor spaces that are ideal for roller skating. They are long and narrow, contain poles and barriers, and afford little to no space to navigate or avoid hazards, even when the vehicles are not moving. BART has pointed to evidence that roller skate users typically require several feet of lateral space in order to propel themselves. Moreover, entering the vehicles requires patrons to travel across tactile warning strips, which have raised bumps intended to warn patrons, particularly people with low vision, that they are nearing the platform edge. BART persuasively argues that the raised bumps pose a

---

[3] While transit providers are required to have priority seating for people with disabilities, they are not required to force other patrons to move to make room for people with disabilities. 49 CFR § 37.167(j)(3).

HSK-SYS-0004

threat when encountered by a roller skate user. Discussions with manufacturers of tactile warning strips confirm that assessment.

Additionally, BART has argued that "falling is an inherent part of in-line skating." They argue that large numbers of skaters fall every year and point to extensive consumer information on hazards of falling and the considerable market for protective gear to protect roller skate users from injuries that could result from falling. While FTA feels that BART overstates the risk of falling, there is substantial evidence that roller skaters can and do fall. Intuitively, the risk of falling is heightened where there is an unstable surface, such as the vehicle floor of a moving rapid rail vehicle.

When a roller skater user falls, he or she is likely to injure others who are nearby. Even during non-peak hours, riders on rapid rail vehicles are in close proximity because of the limited space in the vehicles. Consequently, FTA agrees with BART's conclusion that allowing riders to use roller skates on BART vehicles would create a direct threat to the safety of others. BART is therefore not required to make a modification to their service to allow you to use your roller skates on vehicles.

### 2. BART has demonstrated that use of roller skates as a mobility aid on BART platforms creates a direct threat.

Much of this analysis relies on facts established in the previous section. Vehicles enter and leave BART stations at rapid speeds. The tactile warning strips create a tripping hazard to roller skate users boarding and alighting from vehicles. Roller skate users require significantly more lateral space to move than patrons who walk or use other mobility aids. Additionally, movement in narrow corridors, such as station platforms, increases the risk of falling.

There are additional risks that make roller skate use in BART stations more hazardous than use on rapid rail vehicles. Principally, there are no barriers in BART stations that protect patrons from falling onto the tracks. The risk of injury to individuals who fall onto empty tracks is substantial. It is even more dangerous for patrons to fall in front of a moving vehicle or to collide with a moving vehicle. A collision between a roller skate user and a patron, particularly an inattentive one, could cause such a fall or collision. Additionally, BART points to evidence that even where the roller skate user, and nobody else, falls onto the tracks, there are significant safety risks to BART personnel and vehicle passengers. The dangers to people on vehicles include injury from making sudden emergency stops and severe emotional trauma, which BART shows is often experienced by vehicle operators after collisions with people on the tracks. The dangers to people at the station result from likely rescue attempts where anyone falls onto the tracks and include electrocution from the third rail, injury while descending onto the tracks, and collision with BART vehicles. BART's conclusion on this point is based on past incidents in which patrons have fallen onto the tracks at BART facilities.

Although the risks of colliding with another patron are less when there are fewer patrons on the station platform, there is no point in the service day where the danger is sufficiently reduced to eliminate the threat. With increased wait time between vehicle arrivals (headways) and the need to transfer between different routes, it is likely that the platform will be crowded, at least occasionally, outside of peak service hours. Moreover, many of the key factors contributing to

HSK-SYS-0005

the danger, such as the presence of fast moving vehicles, the lengthy fall onto the tracks, the lack of barriers between the platform and the tracks, and the narrow walkways at points on the platform, are equally present during peak and off-peak service hours. Consequently, the danger to others that results from use of roller skates on BART platforms remains substantial at all times of the day.

For the preceding reasons, FTA agrees with BART's argument that allowing you to use roller skates on a BART platform creates a direct threat to the safety of others and may therefore be prohibited.

### 3. BART has not demonstrated that use of roller skates as a mobility aid in BART concourse areas creates a direct threat to the safety of others.

Many of the hazards that exist on BART platforms and in BART vehicles are absent in BART concourses. There are no dangers from fast moving vehicles or risks of falling onto the tracks. Unlike the vehicles, the concourse floor is stable. Moreover, the concourse spaces are not long and narrow or strewn with obstacles. Except for momentary shelter from rain, there is no reason for large numbers of patrons to gather and wait in the concourse area.

According to BART, wet surfaces are the most likely cause of a fall in the concourse areas. Although slips are concededly a risk, they are not a problem that is unique to roller skate users. As BART indicates, wet surfaces and spills should be marked and cleaned up by BART staff. BART also notes that the wet surfaces most often result from rain. In 2006, there were 95 days of rain in San Francisco (source: Golden Gate Weather Service - http://ggweather.com/sf/daily.html#2006). With few exceptions, rain occurs primarily between the months of October and May. On many of the days in past years when it rained, there was insufficient rainfall to create puddles. Consequently, at the very least, rainfall should not be a concern for most days of the year. On the relatively few days where there is sustained rainfall, a restriction on roller skate use may be appropriate, but it is also unlikely that a roller skate user would attempt to access a station in such a situation.

In both the case of spills and rainwater, the risk from wet surfaces is created by the liquid itself, and affects all patrons (except possibly wheelchair and scooter users), regardless of whether they are using roller skates. Consequently, singling out roller skate users seems inconsistent with the general acceptance of the hazards posed to patrons in general.

BART has also argued that the size of the roller skates creates a tripping hazard to other patrons. This argument is minimized by the fact that BART allows patrons to bring (but not ride) bicycles into BART stations outside of peak service hours. Furthermore, BART does not prohibit bags, service animals, strollers, and many other items that could be tripping hazards. Consequently, for BART to single out an in-line skate as particularly risky, where the skate is only a few inches longer than a regular shoe, seems too speculative and inconsistent to justify prohibiting roller skates for direct threat.

BART points to the fact that concourses were not designed for shared use between pedestrians and roller skate users. On the other hand, BART accommodates many other mobility aids, including wheelchairs. DOT has issued guidance saying that in most cases, use of a Segway as a

6

mobility aid by people with disabilities must be permitted in transit facilities. It is hard to distinguish the risks of collision from Segway use or, as you indicate, wheelchair use from the risk that would result from roller skate use in concourse areas. Again, the fact that BART allows patrons to walk with their bicycles in BART stations at certain times of the day indicates that, at least for those times, concourses are not so crowded that collisions would be inevitable.

BART alleges that surfaces in BART stations, even when dry, create a risk of falling. A roller skate user who loses control or falls is more likely to cause injuries to other patrons. Notably, as you have pointed out, because roller skates are secured to the user, there is no risk of the mobility aid itself causing injury, such as would occur if a user lost control of a skateboard, or even a wheelchair, scooter, or Segway. BART argues that roller skate use in concourses creates an unacceptable risk of falling as a result of slick and changing surfaces. BART does not explain why any of the surfaces used in its stations are dangerous when dry and skated over at low speed. Furthermore, BART does not demonstrate that dramatic changes in surface character are common in BART concourse areas or that such changes would create significant risk of falling when encountered at low speed.

Concededly, there are increased risks of collisions and injury where a roller skate user travels at high speed. Many of the same risks apply to people using other mobility aids at high speed, or running. BART may, and likely has, restricted running and high speed mobility aid use in its facilities. Such a rule of general application could just as easily be applied to a roller skate user.

Data provided by BART shows that collisions already occur in BART concourse areas. Collisions are an unavoidable occurrence wherever people are in close proximity, but they are not uniquely associated with roller skate use. As you indicate, BART has not presented evidence that roller skate users are unable to stop as quickly as someone moving at comparable speed in a wheelchair, Segway, or even walking. BART has not demonstrated that speed restrictions cannot be effectively applied to roller skate users in the same fashion as they are applied to other patrons. Consequently, we are unable to determine that a direct threat exists when using roller skates in BART concourse areas.

### 4. BART has not demonstrated that use of roller skates as a mobility aid in BART controlled outside areas near stations creates a direct threat to the safety of others.

Notably, BART allows bike riders access to BART stations. Many stations have bike racks. BART has not indicated why a roller skate user could not access BART stations by the same means as bike riders. Where there are roadways for cars traveling at low speeds, there are no obvious safety risks to others that result from sharing the roads with a roller skate user traveling at similar speed and subject to similar restrictions.

Moreover, in pedestrian areas in and around BART stations, there is typically more space than in stations. Consequently, the areas outside of BART stations may be the safest places to roller skate. It seems that collision with another patron is least likely because a roller skate user can more easily maintain a significant distance from pedestrians. As with spills in concourse areas, cracks and uneven surfaces are hazards to all patrons, and BART should already mark and repair them for the safety of all patrons.

7

Admittedly, this is the hardest area to apply direct threat analysis because of the variety of situations and dangers that could be encountered. Accordingly, more careful analysis of specific areas may reveal the existence of direct threats that are particular to the location. Nonetheless, it remains BART's burden to demonstrate that such specific risks exist.

## C. Conclusion

The FTA Office of Civil rights has not found BART to be in violation of 49 CFR § 37.21(c) of the DOT ADA regulations in prohibiting roller skate users access to BART platforms or heavy rail vehicles. Accordingly, BART has no obligation to amend its current policies as they concern platforms and heavy rail vehicles.

We have concluded that BART must allow your use of roller skates in BART station concourses and in areas outside of BART stations pursuant to 49 CFR §§ 37.5 and 37.21(c) and 28 CFR § 35.130(b)(7). We will communicate our conclusion to BART and place BART in follow-up status as to these two issues. BART remains free to impose reasonable restrictions on roller skate access, however, such as for heavy rain days, stairs, and escalators. Any such restriction should be supported by specific fact-based analysis.

As the investigation phase of this process has been completed, we are closing your complaint as of the date of this letter. If you have any questions regarding our determinations, please contact Jonathan Klein, at 202-366-0809 at his electronic mail address: *jonathan.klein@dot.gov*. Thank you for bringing your concerns to our attention and for your patience as we deliberated and responded to your concerns.

Sincerely,

David W. Knight
ADA Team Leader
Office of Civil Rights

cc:     Dorothy Dugger, BART General Manager
        Susan Gallagher, BART Customer Access Department
        Thomas C. Lee, BART Office of General Counsel
        Shirley Nakao, BART Office of General Counsel
        Len Hardy, BART Chief Safety Officer
        Leslie Rogers, FTA Region IX Regional Administrator
        Derrin Jourdan, FTA Region IX Civil Rights Officer

8

EXHIBIT B (HSK-SYS-0009-0011)

**"The Wilkes Plan" – BART'S ADA-Compliant Transportation Proposal in Response to FTA Letter of Finding**

Submitted by BART in response to the 2007 DOT–FTA Letter of Finding (Complaint No. 06-0135), this document outlines a detailed alternative transportation plan that grants Mr. Wilkes access to ParaTransit.



**SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT**
300 Lakeside Drive, P.O. Box 12688
Oakland, CA 94604-2688
(510) 464-6000

2008

**Gail Murray**
PRESIDENT

**Thomas M. Blalock, P.E.**
VICE PRESIDENT

**Dorothy W. Dugger**
GENERAL MANAGER

DIRECTORS

**Gail Murray**
1ST DISTRICT

**Joel Keller**
2ND DISTRICT

**Bob Franklin**
3RD DISTRICT

**Carole Ward Allen**
4TH DISTRICT

**Zoyd Luce**
5TH DISTRICT

**Thomas M. Blalock, P.E.**
6TH DISTRICT

**Lynette Sweet**
7TH DISTRICT

**James Fang**
8TH DISTRICT

**Tom Radulovich**
9TH DISTRICT

February 8, 2008

Mr. Troy Wilkes
338 South Fremont St. #211
San Mateo, CA 94401

Dear Mr. Wilkes,

As you know, the FTA has issued a letter of finding in the matter of your complaint against BART. FTA has also asked us to develop a plan for your transportation.

In the letter of finding which was sent to you, the FTA stated that it agreed with BART's reasoning that there were significant safety risks from allowing someone to use rollerblades on the platform or on a train. FTA did not agree with BART's reasoning about safety in the concourse or in the outside areas of the station. BART has responded to the FTA with a letter containing additional materials about safety and also our disagreements with some legal aspects of the case.

However, BART has agreed to move ahead on a plan for you. As a practical matter, the FTA's finding, that you can be prohibited from using your rollerblades within some areas of the BART system, does not meet your needs. On a number of occasions, you have stated that you are unable to take off your rollerblades to enter a transit vehicle or facility due to pain when you go through the necessary motions to remove them. Given your stated inability to remove your rollerblades once you reach the areas of the BART system where you would not be permitted to use them, you remain unable to use the BART system under the FTA's decision.

Accordingly, BART will support your application for regular eligibility for ADA paratransit service through the San Mateo County Transit District (SamTrans), the transit agency serving your area of residence. Through reciprocal agreements, your eligibility for paratransit through SamTrans would allow you access to all the paratransit systems in the Bay Area. We have prepared the attached letter to SamTrans to support your application.

In addition, we will request of our paratransit partners that you be allowed to ride paratransit vehicles while wearing your rollerblades. In discussions with paratransit staff, we believe that you can be safely boarded on a paratransit vehicle while wearing rollerblades. Some operators may ask that you use a chair



HSK-SYS-0009

Troy Wilkes
February 8, 2008
Page 2

to board via the lift and we ask that you cooperate in boarding in the manner that the individual operator considers safe.

We have discussed this letter with Bill Welch, SamTrans Accessible Services Manager. They will be sending you eligibility materials in the mail and will continue to carry you on a temporary basis until 30 days from the date of this letter. Please make your application promptly so that you will have sufficient time to apply and have the required interview before your temporary eligibility lapses.

If you have any questions, please do not hesitate to call me at 510-464-6184 or email me at sgallag@bart.gov.

Sincerely,

Susan Gallagher
BART Manager of Paratransit Programs

Cc:    Bill Welch, Accessible Service Manager, SamTrans
       Tom Lee, BART Legal Department
       Shirley Nakao, BART Legal Department
       Jonathan Klein, Federal Transit Administration



**SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT**
300 Lakeside Drive, P.O. Box 12688
Oakland, CA 94604-2688
(510) 464-6000

**2008**

**Gail Murray**
PRESIDENT

**Thomas M. Blalock, P.E.**
VICE PRESIDENT

**Dorothy W. Dugger**
GENERAL MANAGER

**DIRECTORS**

**Gail Murray**
1ST DISTRICT

**Joel Keller**
2ND DISTRICT

**Bob Franklin**
3RD DISTRICT

**Carole Ward Allen**
4TH DISTRICT

**Zoyd Luce**
5TH DISTRICT

**Thomas M. Blalock, P.E.**
6TH DISTRICT

**Lynette Sweet**
7TH DISTRICT

**James Fang**
8TH DISTRICT

**Tom Radulovich**
9TH DISTRICT

February 8, 2008

To Whom It May Concern:

This letter is in support of Mr. Troy Wilkes' application for ADA paratransit. Mr. Wilkes has been in correspondence with BART for some time. Mr. Wilkes has supplied us with documentation of a mobility impairment involving pain when walking. Mr. Wilkes has adopted the use of rollerblades as a mobility device.

For safety reasons, BART will not permit Mr. Wilkes to use BART while wearing his rollerblades. Mr. Wilkes has also stated that he is unable to remove the rollerblades to walk for the distances which would be necessary to use BART. As long as he is unable to remove the rollerblades, he is prevented by his disability from using BART, an accessible transit system.

Given the facts as stated above, I believe that Mr. Wilkes is eligible for ADA paratransit. If you have any questions, please call me at 510-464-6184.

Sincerely,

*Susan B Gallagher*

Susan B. Gallagher
Manager of Paratransit Programs
510-464-6184


cc:    Bill Welch, Accessible Services Manager
       SamTrans



www.bart.gov

HSK-SYS-0011

EXHIBIT C (HSK-SYS-0012—0017)

**Hardy Safety Study**

BART Safety Officer report states that they have not found any incidents or injuries involving inline skates in their past data. Just the fact that this officer falsely references in-line skater, rather than inline skater shows pure ignorance. Then, he goes on to manufacture fake data that a skater would fall and injure himself, collide with passengers injuring them, or injure both themselves and a passenger.

However, Mr. Wilkes' use of inline skates is not as typical skates, but as a prosthetic device using a wheelchair standard of access.



**B A R T**

**SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT**
300 Lakeside Drive, P.O. Box 12688
Oakland, CA 94604-2688
(510) 464-6000

**Lynette Sweet**
PRESIDENT

**Gail Murray**
VICE PRESIDENT

**Thomas E. Margro**
GENERAL MANAGER

**DIRECTORS**

**Gail Murray**
1ST DISTRICT

**Joel Keller**
2ND DISTRICT

**Bob Franklin**
3RD DISTRICT

**Carole Ward Allen**
4TH DISTRICT

**Zoyd Luce**
5TH DISTRICT

**Thomas M. Blalock**
6TH DISTRICT

**Lynette Sweet**
7TH DISTRICT

**James Fang**
8TH DISTRICT

**Tom Radulovich**
9TH DISTRICT

July 23, 2007

Jonathan Klein, Esq.
United States Department of Transportation
Federal Transit Administration
Office of Civil Rights
1200 New Jersey Ave., SE
TCR-10  E54-435
Washington, DC 20590

Dear Mr. Klein,

This letter is in reference to the complaint of Mr. Troy Wilkes that the San Francisco Bay Area Rapid Transit District (BART) has advised him that he is not allowed to use his in-line skates on BART property, even though he maintains that he uses them as a mobility device. This letter and report concern the potential safety risks that would be associated with allowing a disabled patron to skate in areas of the station outside the platforms and vehicles. A previous report already submitted to your office dealt extensively with risks associated with platforms and vehicles.

As you know, in-line skating in a transit facility is a violation of California Penal Code Section 640 (b)(10). BART enforces this Penal Code section so in-line skaters do not use the system. As a result, we have not found any incidents or injuries involving in-line skaters in our past data. Nevertheless, BART staff has prepared this report based on our general data to illustrate that safety issues would occur if Mr. Wilkes were allowed to use his skates in the station.

It is my professional opinion that allowing an in-line skater to skate within our station areas would constitute a significant safety risk. The primary risks to allowing someone to travel on in-line skates at our stations would be that the skater would fall and injure himself, the skater would collide with other passengers and injure them, or the skater would both fall and injure himself as well as injure other passengers in the path of the fall.

My opinion is based on BART's experience and five years of incident data from our concourse areas, bus areas, parking lots, and walkways as summarized in the attached report.

HSK-SYS-0012

Jonathan Klein
July 23, 2007
Page 2

BART is a heavily used system. More than 100,000,000 passengers used our 43 stations in FY 2007. Our stations have been designed with substantial pedestrian, bus, and automobile access in mind. In-line skating and skateboarding are prohibited in the stations. Limited bicycle access is allowed although passengers are required to walk their bikes in pedestrian areas, and bicycles are totally prohibited inside many stations and trains during the rush hour.

All of our stations have multiple bus stops and most have extensive parking, both surface and lots. The station property generally has a complex roadway and pedestrian system to serve these access modes. The exterior parts of the station have roadway and walkway surfaces of asphalt, concrete, cobbles, and brick.

The concourse areas in the station serve many functions. The spaces are designed for large numbers of pedestrian to travel to and from the platforms and to queue while using fare machines, waiting for buses, using faregates, getting information, or making purchases from vendors. The concourse areas have a wide variety of hard surfaces ranging from marble to brick.

No part of the BART system has been designed to accommodate pedestrian movement intermixed with in-line skating. The underfoot surfaces are often basically unsuitable for in-line skating. In addition, the pedestrian routes around and through the station area are narrower, have sharper radii, and more pedestrian furniture than would be suitable for a mixed-use path.

Although BART is a very safe system, passenger incidents and injuries have occurred at every station. The most common incidents are falls. Most of the falls that are reported involve some level of injury and overall about 25% of the injured patrons are sent to the hospital. Passengers who fall inside the station commonly cite water or other liquid on the floor as the reason for their accident. Many BART stations are open to the weather and parts of the floor are unavoidably wet during inclement weather. In addition, although BART prohibits drinking in our stations, some patrons do spill liquids inside the station. Rainwater and spills are marked and cleaned as soon as possible but sometimes they cause slips and falls before staff can clean them up. Falls in the outdoor areas of the station are most commonly ascribed to uneven asphalt or pavement, even though BART identifies and repairs tripping hazards as soon as possible.

In-line skating resources reviewed by BART staff recommend that in-line skaters avoid wet pavement, spills, and uneven surfaces because of the risk of falls. However, avoiding these surfaces would be very difficult for an in-line skater traveling on BART, making falls probable.

There is a significant risk to other passengers from the in-line skater. In the crowded station areas, the differential speed of an in-line skater would contribute to a high risk of collisions and potential falls. A falling in-line skater would be likely to collide with others in many parts of the station, and the speed of the skater would significantly increase the severity of injuries that occur. In the data we found 14 cases where a collision between two pedestrians caused one to fall. Even though riding skateboards is prohibited, and bicycles are restricted at crowded times,

HSK-SYS-0013

Jonathan Klein
July 23, 2007
Page 3

there were also 7 instances of other passengers being injured by a skateboarder or through collision with a bicycle. Importantly, our elderly patrons suffer a disproportionate number of falls and injuries now, and would be most at risk in an encounter with an in-line skater.

Again, it is my opinion that allowing a person to use in-line skates in the BART system would pose a significant safety risk to our patrons, particularly the elderly, and to the in-line skater himself. I believe this is supported by sound reasoning and the data submitted in the attached report.

Sincerely,

Len Hardy
Chief Safety Officer
San Francisco Bay Area Rapid Transit District

Cc:    Tom Lee, BART Legal Department
       Shirley Nakao, BART Legal Department
       Susan Gallagher, BART Customer Access Department
       David Knight, FTA Office of Civil Rights

San Francisco Bay Area Rapid Transit District
Staff Report: Safety Issues In BART Concourse And Unpaid Areas.

This report responds to an FTA request that BART provide further analysis of safety issues related to the possibility of allowing a disabled in-line skater to use his in-line skates in the station property, other than the platforms or trains. This report is based on incident reports maintained by the BART Safety Department.

BART keeps a variety of records. The Safety and Transportation Departments keep records of all incidents reported by Station Agents or other staff. Most of the relevant incidents are falls. Normally falls that result in a formal incident report are those involving an injury.

A review of incident reports for the past five years shows that every station in the system has had reportable incidents over the past five years. A summary follows.

### In Bus Areas, Sidewalks, and Parking Lots (2002-2007)

165 injury incidents were reported, primarily falls. In a majority of the cases, the patron stated that the reason for the fall was un-even pavement. Despite the fact that skateboards are not allowed on the station property, one incident involved an elderly patron struck by a skateboarder.

21% of the incidents involved an elderly rider, aged 65 or older. 38% of the incidents resulted in the patron being sent to the hospital.

### In Concourse and Free Area of Station (2002-2007)

375 incidents were reported, primarily falls. The most common single cause of falls was the patron slipping on some water or other wet substance on the floor. 73 reported water or wetness as the cause. Others listed a change in the flooring surface (e.g. rug to terrazzo) as the cause. 14 incidents listed a collision with another pedestrian patron as the cause of the fall. In an additional 7 cases the cause of the fall or injury was collision with a bicyclist or skateboarder.

A number of incidents involved the faregates with people tripping, going too fast, or going too slow, and being pinched by the faregate closing.

11% of the incidents and accidents involved an elderly rider, aged 65 or older. 18% of the incidents resulted in the patron being sent to the hospital.

Previous correspondence and reports to the FTA did not included data on stairs or escalators. Because all BART stations have elevators, it was assumed that an in-line skater using the system would be required to use the elevator. Risks of using stairs or

1

HSK-SYS-0015

escalators while wearing skates are self apparent. However, the following is included for information to supplement the previous reports. This data comes from a report that was prepared while BART staff were considering a policy to allow patrons walking bicycles to use the escalators. That policy has been rejected for safety reasons.

### Stairs and Escalators (2003-2005)

There are more incidents and accidents on stairs and escalators than in other parts of the station property. The following information is from a review of Stair and Escalator Incidents for the calendar years 2003, 2004, and 2005. All BART patrons must, at some point in their trip, change levels. Therefore, more than 300,000 people per weekday take the stairs or escalators, while a relatively very small number use the elevators.

919 incidents and accidents were reported on stairs and escalators in the three years studied.

The rate at which elderly people have accidents on stairs or escalators is disproportionately high. People 65 or older constitute only about 4% of our riders (BART Customer Satisfaction Survey of 2004) but have 21% of the accidents on stairs and escalators. The percentage of accidents on ascending escalators is particularly high—30% of the accidents involving patrons over 65.

It is BART policy to prohibit bicycles on the escalators and to ask cyclists to carry their bike up or down the stairs or wheel it into the elevator. Some bicycle advocates have expressed the concern that carrying a bike up or down stairs is risky. However, the incident history does not support this. There has been only one reported stair incident in the past three years.

Although it is prohibited, some cyclists ride the escalators with their bikes. The cycling community has generally maintained that they believe this is a safe practice. However, the reports show the contrary. In the three years studied, there were 9 incidents and accidents involving bicycles on the escalators. The accidents are notable in that in more than half the accidents, patrons other than the cyclist were injured. This differs from other escalator injuries which generally involve a single patron.

In addition, 4 of the 9 accidents involved the bicycle wedging or jamming in the escalator. The barrier caused by a wedged bicycle could present a significant safety risk on a crowded escalator and the data shows that a wedged bicycle is a real possibility.


Report prepared by BART staff, July 2007
Based on Patron Incident Reports from 2002-2007

2

-----Original Message-----
From: Sgallag@bart.gov [mailto:Sgallag@bart.gov]
Sent: Thursday, June 14, 2007 11:48 AM
To: HandicapSkater
Cc: David.Knight@dot.gov; Donna.Walton@dot.gov;
Jonathan.Klein@dot.gov;
Snakao@bart.gov; Tlee@bart.gov; Bill Welch; Annette Williams; Weinstein
Mark
Subject: Temporary Paratransit

Dear Mr. Wilkes:

As you know, FTA has suggested that BART offer you temporary paratransit
eligibility. Attached is a letter and a brief application form which
includes necessary contact information only. Please return it to me as soon
as possible and I can enroll you in paratransit within a few days.

Please be aware that although I can take an electronic copy of your
information and have it entered in the database, you will need to
communicate with the paratransit providers by other means. As far as I
know, none of the paratransit systems in the Bay Area is set up to take
reservations or conduct business with clients via email. All business is
done by phone, fax, letter, or in person.

I hope to hear from you soon.

(See attached file: Paratransit Cover Letter Second.doc)(See attached file:
EBPC Application Shortened.doc)

Susie

Susan Gallagher
Manager of Paratransit Programs
Customer Access Department
San Francisco Bay Area Rapid Transit District 300 Lakeside Drive, 16th
Floor Oakland, CA 94612

510-464-6184
Cell 510-459-5723
Fax 510-464-6143

EXHIBIT D (HSK-SYS-0018)

**2004 Legal Aid Society of San Mateo Correspondence with BART**

The Legal Aid Society of San Mateo (SMLAS) was not receiving timely responses, stated they did not have the funds to help the Plaintiff, and to file an ADA complaint.

Sent: Wednesday, June 09, 2004 10:01 AM
To: 'Troy Wilkes'
Subject: RE: BART Status

Dear Troy:

As I have informed you, on June 1st, I talked to Carter Mau and Tom
Lee (attorney at Office of the General Counsel) and they informed me
that Mr.. Lee had work on a draft and the draft is pending review by
BART. I left another message with Tom Lee regarding the status of the
letter today.

If they do not respond in a reasonable time, I think we can proceed with
submitting the Title II Complaint with the Department of Justice ("DOJ").
The DOJ, Civil Rights Division, prefers that complainants try to resolve
the dispute through a complaint/grievance with the institution purportedly
in violation first. This is why I am waiting for BART to respond to our
letter. Your other option will be of course to file an ADA case in state or
federal court. But as I have expressed to you previously, we do not have
the resources here to represent you.

If I do not hear from Mr. Lee by the end of the week, I will send him a
letter to let him know that we intend to file a Title II Complaint with DOJ
in 10 days.

Best Regards,


Suzette Lin
Staff Attorney
Legal Aid Society of San Mateo County
521 East 5th Avenue
San Mateo, California 94402
(650)375-0185 ext. 3302

-----Original Message-----
From: Troy Wilkes [mailto:yogis@mindspring.com]
Sent: Friday, June 04, 2004 3:14 PM
To: 'Suzette Lin'
Subject: BART Status

FYI,

    I have not received anything from them. So, I was curious what the
next steps were.

Thanx,
Troy
HandicapSkater

HSK-SYS-0018

EXHIBIT E (HSK-SYS-0019)

**SMPD Officer Julio Jolivette falsifying an incident report leading to suspension of Plaintiff's driving privileges.**

Incident letter falsely stating Plaintiff did not have control of his motorcycle, and harassed despite having a handicap plate on the motorcycle.

| | | | FOR DMV USE ONLY |
|---|---|---|---|
| | | | X- ( ) |

Destroy all previous versions of this form.

☐ NOTICE OF PRIORITY RE-EXAMINATION OF DRIVER (Driver Incapacity)

The driver listed below committed a violation of the California Vehicle Code (CVC) §§21000 through 23336 and should be re-examined pursuant to CVC §12818. At the time of the violation, the driver exhibited evidence of incapacity which reasonably led me to believe that this person is not capable of operating a motor vehicle without presenting a clear or potential danger, or risk of injury to himself/herself or others. As required by law, on the date below, I issued a copy of this Notice of Priority Re-examination/Notice of Suspension for Non-Compliance to the driver listed below.

The driver does not have to be cited for one of the above CVC sections. Please indicate evidence of the incapacity in the Summary area below. If the driver was involved in a traffic accident, attach a copy of the report. You must give a copy of this form to the driver.

If this form is being issued as a Notice of Priority Re-examination/Notice of Suspension for Non-Compliance, immediately fax the document (if fax available) to the Driver Safety Office nearest the driver's home (see reverse), then mail the original Notice to the same office.

## NOTICE OF SUSPENSION FOR NON-COMPLIANCE

**INSTRUCTIONS TO DRIVER**
If the above box is checked, you must contact the Department of Motor Vehicles (DMV) for a re-examination under CVC §§12818 and 12819. If you do not call or appear within five (5) working days, your privilege to drive in this state will be suspended until you satisfactorily complete a re-examination. SEE IMPORTANT PRIORITY RE-EXAMINATION INFORMATION ON THE REVERSE SIDE OF THIS FORM.

☒ **REQUEST FOR REGULAR RE-EXAMINATION OF DRIVER** (Officer's instructions on reverse.)
The driver listed below should be re-examined by DMV, but does not require a Priority Re-examination.

| DATE | TIME | DRIVER LICENSE NO. | STATE | ZIP CODE |
|---|---|---|---|---|
| 10/25/21 | 1807 | B3735242 | CA | 84161 |

NAME (FIRST MIDDLE LAST)
MICHAEL TROY WILKES

MAILING ADDRESS
2201 BRIDGEPOINTE PKWY C2246

| CITY | STATE | ZIP CODE | DRIVER'S DAYTIME PHONE NO. |
|---|---|---|---|
| FOSTER CITY | CA | 94404 | |

LOCATION OF ACCIDENT
HILLSDALE / SARATOGA - SAN MATEO

| ACCIDENT NUMBER NO. (ATTACH COPY IF AVAILABLE) | CITY | COUNTY |
|---|---|---|

**OBSERVED DRIVING BEHAVIOR**—Check appropriate boxes for driving problems you observed (Use space below if needed for additional comments.)

☒ Responding incorrectly to Emergency Signal/Lights
☐ Drifting or weaving in and out of lanes
☐ Caused, or nearly caused, collision
☐ Not reacting to other cars, pedestrians, etc.
☐ Driving on wrong side of road
☐ Driving on sidewalk
☐ Driving at wrong lane
☐ Driving too slow, impeding traffic
☐ Failed to stop at red light/stop sign
☐ Unsafe/inappropriate lane change
☐ Inappropriately stopped

☐ Failed to yield right-of-way
☐ Lost control of vehicle
☐ Struck stationary object
☐ Failed to go on green light
☐ Driving without lights during darkness
☐ Made turn from wrong lane
☐ Fell asleep while driving
☐ Violent or aggressive driving
☒ Not adequately controlling vehicle
☐ Other Observations

RECEIVED
OCT 26 2021
SNF DSO

**DRIVER CONDITION** (Observations after Stop/Collision)—Check all appropriate boxes below. Please use the space below to provide specific details, if known, and the driver's nominal physical or mental condition such as name of disease or illness, any medications taken, etc.

☐ Confused, disoriented, incoherent, or unaware of actions
☒ Reported/Observed Medical Condition
☐ Under the influence of alcohol
☐ Medicated
☐ Vision Condition/Visual Impairment
☐ Mental/Emotional Condition
☒ Driver reported he/she did not see cars, pedestrians, etc.
☒ Difficulty Walking
☐ Weakness or Coordination Problems

☐ Alcohol/Drug Use (Describe below)
☐ Confused by traffic
☐ Lost or confused while driving near home
☐ Blackout/Seizure/Fainting
☐ Driver appears to need help with hygiene and/or dressing appropriately
☐ Other Observations

**SUMMARY:** You may use the space below to further describe actions of the driver which led you to believe a re-examination is needed - describe any impairment, serious physical injury or illness, mental impairment or disorientation. Describe any traffic law violations whether or not a citation was issued.

DRIVER WITNESSED DRIVING A MOTORCYCLE WITH ROLLERSKATES. AS A MOTOR CYCLE OFFICER, I RECOGNIZE THIS TO BE UNSAFE OPERATION OF A MOTORCYCLE. DRIVER WAS STOPPED AND BECAME UPSET BECAUSE HE CLAIMED THIS HANDICAP. WAS LIMITED TO USE HIS MOTORCYCLE WITH SKATES. I DISAGREED BASED ON OBSERVATION AND PERSONAL EXPERIENCE. DRIVER FAILED TO SHOW HOW HE SAFELY OPERATES THE M/C

SAN MATEO PD

| ADDRESS | | PHONE | |
|---|---|---|---|
| 200 FRANKLIN PKWY | | SAN MATEO 94403 | (650) 522-7700 |

OFFICER NAME
T. JALNETTE

BADGE OR ID NUMBER
17

I certify (or declare) under penalty of perjury under the laws of the State of California that the information I have provided is/are correct.

| OFFICER SIGNATURE X | DATE 10/25/21 | DATE MAILED 10/25/21 | COPY GIVEN TO OR NOTIFIED OF REASON? ☒ Yes ☐ No |
|---|---|---|---|

White: DMV    Canary: Law Enforcement    Pink: Driver (Priority Re-Exam Only)

HSK-SYS-0019

EXHIBIT F (HSK-SYS-0020)

**DMV Order of Reinstatement of Driving Privileges**

After passing the CA motorcycle lollipop test on skates, the DMV put in their records: "Your [Plaintiff] driving record was updated to reflect "Driver operates a motocycle and class C vehicle using inline skates."

CALIFORNIA STATE TRANSPORTATION AGENCY

GAVIN NEWSOM, *Governor* **906**

**DEPARTMENT OF MOTOR VEHICLES**
LEGAL AFFAIRS DIVISION
Driver Safety Branch
1377 Fell Street, 2nd Floor
San Francisco, CA 94117
Telephone: (415) 557-1170    FAX: (415) 557-7375



**DMV USE ONLY**

☒ Applicant cleared by Driver Safety.  OK
   to process.
☐ Law ☒ Vision ☒ Drive Test(s) Passed
Date __6·16·22__    Initials __KC__

## ORDER OF SET ASIDE
## OR REINSTATEMENT

Michael Wilkes
2201 Bridgepointe Pkwy C246
Foster City, CA 94404

| | |
|---|---|
| DRIVER LICENSE NUMBER | B3735242 |
| DATE OF THIS ORDER | June 17, 2022 |
| FINANCIAL RESPONSIBILITY FILE NUMBER | |
| ACQUITTAL NUMBER | |

☒ After a review of the information on file, including any evidence which you may have presented, the action(s) effective **March 29, 2022**, pursuant to §13953 and §_____ of the Vehicle Code (VC), ☐ is set aside, ☒ is ended, or ☐ may be ended if you comply with the reinstatement requirements shown below:

☐ In compliance with your request, a Department Review of the information and evidence submitted at your hearing has been completed, pursuant to §14105.5 VC. The action effective _____, pursuant to §_____, of the Vehicle Code (VC), ☐ is set aside, ☐ is ended, or ☐ may be ended if you comply with the reinstatement requirements shown below:

☐ You were issued an Order of Suspension effective _'___, from a DUI arrest occurring on _____.  Following receipt of certified court orders of acquittal pursuant to §13353.2(e) VC, the Order of Suspension has been VACATED and SET ASIDE pursuant to §13551 VC.

☐ The APS DUI probation violation action effective _____, pursuant to §13353.2 or §13353.1 VC remains in effect.
☐ The APS action pursuant to §13353.2 VC or §13353 VC effective _____, remains in effect.
☐ **DO NOT** return to the DMV field office, your license will be mailed to you.

**REINSTATEMENT REQUIREMENTS**
Your driving privilege may be reinstated on **June 16, 2022**, provided that you:
   ☐ File proof of your financial responsibility as provided in §16430 VC (see reverse or attached).
   ☐ Pay a reissue fee to the department ☐ $55 ☐ $100 ☐ $125.
   ☐ Obtain a Notice of Completion Certification (DL 101) from a California State Department of Alcohol and Drug Programs approved alcohol treatment program.
   ☐ Clear the ☐ suspension ☐ revocation pursuant to §_____ VC.
   ☐ Clear the ☐ failure to appear in court ☐ failure to pay a court fine.
   ☐

You may:
   ☒ Retain any valid license which you have in your possession.
   ☐ Use the enclosed temporary license.  Your photo license will be mailed to you.
   ☐ Apply for a ☐ duplicate license ☐ no-fee duplicate license at the nearest DMV field office.
   ☐ Renew your license at the nearest DMV field office.
   ☐ Return to the nearest DMV field office to complete your driver license application.
   ☒ Your driving record was updated to reflect "Driver operates a motorcycle and class C vehicle using inline skates".

Online appointment information may be obtained at the DMV website at:  www.dmv.ca.gov,
or call 1-800-921-1117.  Call 1-800-777-0133 to schedule drive test appointments.

THIS ACTION IS INDEPENDENT OF ANY OTHER ACTION TAKEN BY THE COURT OR THIS DEPARTMENT

| DATE | NAME OF AUTHORIZED DMV EMPLOYEE | SIGNATURE OF AUTHORIZED DMV EMPLOYEE |
|---|---|---|
| 6/17/2022 | Kimberly Chung | X |

California Relay Telephone Service for the deaf or hard of hearing from TDD Phones: 1-800-735-2929; from Voice Phones: 1-800-735-2922

DS 2565 (REV 04/2020)          *A Public Service Agency*

HSK-SYS-0020

EXHIBIT G (HSK-SYS-0021)

**Bill Welch Email Sent to DOT**

**Bill Welch stating that the Plaintiff can expect 2-1/2 hour commutes 1-way for a job, resulting in 4+ hour commuting as a standard, and DOT representatives Jonathon Klein and David Knight approved.**

.

From: Welch, Bill [mailto:welchb@samtrans.com]
Sent: Wednesday, October 31, 2007 3:53 PM
To: 'HandicapSkater'
Cc: Harvey, Chuck
Subject: RE: Jonathon.Klein@dot.gov; David.Knight@dot.gov

Mr. Wilkes,

Redi-Wheels is available to serve you on your new commute trip to Cisco
Systems if you choose not to ride your motorcycle.

As I am sure you are aware, a trip to San Jose where Cisco Systems is
located would require you to transer to Outreach, the Santa Clara County
paratransit service.  The travel time for the combined trips could be 2-1/2
hours, as a Redi-Wheels driver has suggested to you.  I recommend you
check with a Redi-Wheels reservationsit and with Outreach
(408-436-4860) to determine how much time to allow to be sure you
arrive at work on time.

As you know, Redi-Wheels and Outreach are share-ride services that
pick up and drop off other passengers en route.  Adequate time must be
built into schedules to provide this function — and get passengers to their
destinations on time.  For a trip of this length to take 2-1/2 hours is not
unreasonable.

Please let me take this opportunity to inform you that I have extended
your Redi-Wheels eligibility to December 15, 2007 to ensure that ADA
paratransit service is available to you until you hear a formal response
from BART regarding conditions that apply to use of their services.

Bill Welch
Manager
Accessible Transit Services

From: HandicapSkater [mailto:handicapskater@mindspring.com]
Sent: Monday, October 29, 2007 3:03 PM
To: Welch, Bill
Subject: Jonathon.Klein@dot.gov; David.Knight@dot.gov

Mr. Welch,

I am accepting a job today with Cisco Systems again and called
Paratransit to see about transportation to work. In our conversation the
Rediwheels operator explained that it would be a 2-1/2 hour commute
one way, meaning that I would be commuting 5 hours a day to get to
work. Obviously, that is not acceptable and it is urgent that this is taken
care of immediately, because the rainy season is starting and I do not
want to be relegated to commuting back and forth in the rain riding a
motorcycle wearing my prosthetic, skates.

FYI, it takes me 30 minutes to ride my motorcycle to work

HSK-SYS-0021

EXHIBIT H (HSK-SYS-0022—0023)

**Email Correspondence between DOT and BART**


DOT representative Jonathon Klein stating the defendant is right, when asking for pickups at 12:15am after his physical therapy. BART representative Susan Gallagher acknowledges their error.

-----Original Message-----
From: Sgallag@bart.gov [mailto:Sgallag@bart.gov]
Sent: Wednesday, June 27, 2007 4:02 PM
To: HandicapSkater
Subject: Re: Paratransit Hours

RediWheels made an error in turning down the later pick up time.
SamTrans
staff has corrected the error.  Rediwheels will be getting in touch
with
you to schedule the trip.  Thank  you for bringing this to our
attention.

Susie

Susan Gallagher
Manager of Paratransit Programs
Customer Access Department
San Francisco Bay Area Rapid Transit District
300 Lakeside Drive,  16th Floor
Oakland, CA 94612

510-464-6184
Cell 510-459-5723
Fax 510-464-6143

From: Jonathan.Klein@dot.gov [mailto:Jonathan.Klein@dot.gov]
Sent: Wednesday, June 27, 2007 11:58 AM
To: handicapskater@mindspring.com; Sgallag@bart.gov
Cc: David.Knight@dot.gov; Tlee@bart.gov; Snakao@bart.gov
Subject: RE: Paratransit Hours

Hello all

Troy is correct, paratransit service is required to be available during the same days and hours as the fixed route service. The rule is narrow, however, and where certain lines, rather than the entire fixed route system, operate for extended hours, paratransit service is required only from origins to destinations that are within ¾ miles of those bus lines and rail stations.

A transit provider is also permitted to negotiate an actual pickup time up to an hour earlier than the requested pickup time. It is therefore permissible for the transit provider to offer a pickup time of 11:15pm in response to a 12am or 12:15am pickup request. On the other hand, a negotiation is not the same as a take-it-or-leave-it offer. Consequently, where there is a 12am or 12:15am pickup time request, and an offer of 11:15pm pickup time, followed by a rejection of that time by the rider, the transit provider should offer other pickup times that are better fits to the rider's needs.

So, my question to BART is whether fixed route service is available to the location on the day and time that Troy is requesting. If it is available, was there a proper negotiation, or was there either a take-it-or-leave-it offer or a refusal of service from 11:15pm onward?

Thanks
Jonathan

From: HandicapSkater [mailto:handicapskater@mindspring.com]
Sent: Wednesday, June 27, 2007 2:08 PM
To: Sgallag@bart.gov
Cc: Klein, Jonathan <FTA>; Knight, David <FTA>; Tlee@bart.gov;
Snakao@bart.gov
Subject: Paratransit Hours

The fixed route system provides service until 1am and when I tried to make a reservation to be picked up at 12:15pm, I was told that service is only available between 5:30am – 11:15pm at night. The Friday Night Skate does not make it around to that point until 12pm. Therefore, Paratransit is insufficient and I want access to this Friday Night Skate!

No more delays, they constitute "malfeasance of office".

Thanx,
Troy
The HandicapSkater

HSK-SYS-0023

EXHIBIT I (HSK-SYS-0024)

**DOT Asking about Videos to determine Skate viability**

This acknowledges that DOT viewed the videos on my website, because they have been there since ~2005/6 and were recorded in ~2003.

From: David.Knight@dot.gov [mailto:David.Knight@dot.gov]
Sent: Wednesday, June 20, 2007 11:46 AM
To: yogis@mindspring.com
Cc: Jonathan.Klein@dot.gov
Subject: Your Website

Mr. Wilkes,

You stated that you would be linking several youtube videos to your website.
When last we checked, your website was done. Is it back up? If so, can you
provide the URL again?

Thank you.

David Knight, Esq.
ADA Team Leader
Office of Civil Rights
Federal Transit Administration
U.S. Department of Transportation
202.366.0805
202.366.3809 (fax)
david.knight@dot.gov
More information is available at our website:  http://www.fta.dot.gov/ada
-------------------------------------------------------------
We moved! Please update your address book and fax:
1200 New Jersey Ave, S.E.
East Building – 5th Floor, TCR
Washington, D.C. 20590
202.366.3809 (fax)
-------------------------------------------------------------
This e-mail is intended to serve as informal guidance only, and does not
constitute the official opinion of the Federal Transit Administration or the US
Department of Transportation.
-------------------------------------------------------------

HSK-SYS-0024

EXHIBIT J (HSK-SYS-0069)

**Department of Fair Employment and Housing (DFEH) closing a case in 2006**

The Plaintiff's continued pleading to use his biomechanically necessary mobility aid was denied as No Probable Cause To Prove A Violation Of The Statute.

DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov



June 23, 2006

MICHAEL WILKES
338 South Fremont St., #221
San Mateo, CA 94401

RE:    U200506A0013-00-p
       **WILKES/CALTRAIN**

Dear MICHAEL WILKES:

## NOTICE OF CASE CLOSURE

The consultant assigned to handle the above-referenced discrimination complaint that was filed with the Department of Fair Employment and Housing (DFEH) has recommended that the case be closed on the basis of: No Probable Cause To Prove A Violation Of The Statute.

Please be advised that this recommendation has been accepted and the case has been closed effective June 23, 2006.

This letter is also your Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. This is also applicable to DFEH complaints that are filed under, and allege a violation of Government Code section 12948 which incorporates Civil Code sections 51, 51.7, and 54. The civil action must be filed within one year from the date of this letter. However, if your civil complaint alleges a violation of Civil Code section 51, 51.7 or 54, you should consult an attorney about the applicable statutes of limitation. If you signed a settlement agreement resolving your complaint, it is likely that you have waived your right to file a private lawsuit.

HSK-SYS-0069

EXHIBIT K (HSK-SYS-0025—0026)

**San Mateo and San Francisco Superior Courts granting skates as a reasonable accommodation**

Plaintiff tried boarding CalTrain several times in Civil Disobedience to gain a reasonable accommodation.

FORM TO BE KEPT CONFIDENTIAL (IF BOX CHECKED)

APPLICANT (name): TROY WILKES

FOR COURT USE ONLY

Exhibit E

APPLICANT IS: ☐ Witness ☐ Juror ☐ Attorney ☑ Party ☐ Other
Person submitting request (name): TROY WILKES (Defendant in Pro Per)

APPLICANT'S ADDRESS:

TELEPHONE NO.:
NAME OF COURT: Superior Court, San Mateo County
STREET ADDRESS: 500 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch
NAME OF JUDGE: Hon. Susan Greenberg, Com

CASE NAME: WILKES, TROY

ENDORSED FILED
SAN MATEO COUNTY

AUG 2 9 2005

Clerk of the Superior Court
By _____

## REQUEST FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES and ORDER

CASE NUMBER: 904405

Applicant requests accommodation under California Rules of Court, rule 989.3, as follows:

1. Type of proceeding: ☑ Criminal ☐ Civil
2. Proceedings to be covered (e.g., bail hearing, preliminary hearing, particular witnesses at trial, sentencing hearing):
   9-6 Trial
3. Dates accommodations needed (specify):
   9-6-05
4. Impairment necessitating accommodations (specify):
   Broken pelvis and cracked sacroiliac, resulting in a ballistic mobility impairment.
5. Type of accommodations (be specific):
   Access with mobility aid, skates, and a cushioned seat. Also, access to electricity
   for demonstration of scientific evidence on a computer for a ballistic mobility impairment
6. Special requests or anticipated problems (specify):
   Skate access is equivalent to wheelchair accessibility.
7. I request that my identity ☐ be kept CONFIDENTIAL ☑ NOT be kept CONFIDENTIAL.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 8-23-05

TROY WILKES
(TYPE OR PRINT NAME)

▶ Troy Wilkes
(SIGNATURE OF APPLICANT)

## ORDER

☑ The request for accommodations is GRANTED because
 ☑ the applicant satisfies the requirements of the rule.
 ☐ it does not create an undue burden on the court.
 ☐ it does not fundamentally alter the nature of the service, program, or activity.
 ☐ Alternate accommodations granted (specify):

☐ The request for accommodations is DENIED because
 ☐ the applicant does not satisfy the requirements of the rule.
 ☐ It creates an undue burden on the court.
 ☐ It fundamentally alters the nature of the service, program, or activity.
 (Specify):

Date: 8/26/05

_____
JUDGE

Form Adopted by the
Judicial Council of California
MC-410 [New January 1, 1996]

## REQUEST FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES and ORDER

WEST GROUP
Official Publisher

Cal. Rules of Court,
rule 989.3

HSK-SYS-0025

# APPLICANT'S INFORMATION TO BE KEPT CONFIDENTIAL

| | |
|---|---|
| **APPLICANT** (name): Michael Troy Wilkes | **FOR COURT USE ONLY** |
| **APPLICANT is** ☐ Witness  ☐ Juror  ☐ Attorney  ☑ Party  ☐ Other (Specify) | |
| Person submitting request (name): **Michael Troy Wilkes** | |
| APPLICANT'S ADDRESS: **338 South Fremont Street #221** | |
| **San Mateo, CA 94401** | |
| TELEPHONE NO: **(650) 678-0502** | |

**NAME OF COURT:** San Francisco Superior Court - Traffic Division
STREET ADDRESS: 850 Bryant Street, Room 101
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94103
BRANCH NAME: Traffic Division

JUDGE:

CASE TITLE

| | |
|---|---|
| **REQUEST FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES AND RESPONSE** | DEPARTMENT  A |
| | CASE NUMBER: CT05011506 T |

Applicant requests accommodation under rule 989.3 of the California Rules of Court, as follows:

1. Type of proceeding: ☑ Criminal  ☐ Civil

2. Proceedings to be covered (for example, bail hearing, preliminary hearing, trial, sentencing hearing, family, probate, juvenile): **Trial**

3. Date or dates needed (specify): **11/30/06**

4. Impairment necessitating accommodation (specify): **Broken pelvis and cracked sacroiliac joint resulting in a ballistic mobility impairment.**

5. Type or types of accommodation requested (specify): **Access with mobility aid, skates.**

6. Special requests or anticipated problems (specify): **Skate access is equivalent to wheelchair accessibility.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 10/03/06

Michael Troy Wilkes ▶ Michael Troy Wilkes
_(TYPE OR PRINT NAME)_ _(SIGNATURE)_

## RESPONSE

The accommodation request is **GRANTED** and the court will provide the
☒ requested accommodation, in whole
☐ requested accommodation, in part (specify below):
☐ alternative accommodation (specify below):

The accommodation request is **DENIED** because it
☐ fails to satisfy the requirements of rule 989.3
☐ creates an undue burden on the court
☐ fundamentally alters the nature of the service, program, or activity

For the following reason (attach additional pages, if necessary): [See Cal. Rules of Court, rule 989.3(g), for the review procedure.]

For the following duration:
☒ For the above matter or appearance
☐ From (dates):          to
☐ Indefinite period

Date: 10-27-06

Nicole Olcomendy Adams
_(TYPE OR PRINT NAME)_

_(SIGNATURE)_
☐ SIGNATURE FOLLOWS THE LAST PAGE OF THE RESPONSE

Form Approved for Optional Use
Judicial Council of California
MC-410 (Rev. January 1, 2006)

**REQUEST FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES AND RESPONSE**

Page 1
Cal. Rules of Court, rule 989
www.courtinfo.ca

HSK

EXHIBIT L (HSK-SYS-0027—0028)

**Police Reports by SMPD written for Plaintiff using Dr Prescribed Mobility Aid**

The first police report is from the SMPD Officer Julio Jolivette, who cannot charge the Plaintiff for any infraction, sending a falsified incident report to the DMV leading to a 3-month license suspension. The third report was reported, but Plaintiff went to the Apple store to address the problem with the Officer on duty that happened to be the Captain Matt Lethin.

Two of three reports in three years, but I have more to come. This is systemic discrimination that the SMPD is allowing, and at least 2 cases where they refused to handover the bodycam footage potentially to exonerate the Plaintiff covering up discrimination.

# SAN MATEO POLICE DEPARTMENT

## CAD INCIDENT REPORT
### 2110250166

| | |
|---|---|
| **Page** 1 | |
| **10/28/2021** | |

| Location | Cross Streets | City |
|---|---|---|
| E HILLSDALE BL/SEA SPRAY LN | SEA SPRAY LN | FOSTER CITY |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| TS - TRAFFIC STOP | RAMIREZ, RENY | RAMIREZ, RENY |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 10/25/2021 | | T177 | | | | | O |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Warned | | | |

| Vehicles | Associated Incidents |
|---|---|
| 2018 Green Kawasaki Motorcycle, 47DP52/CA | |

| Incident Times | | Special Circumstances |
|---|---|---|
| Received | 18:06:48 | |
| Created | 18:07:01 | |
| Dispatched | | **Persons**     Sex   DOB    Race      DL |
| En Route | | |
| On Scene | 18:07:01 | |
| Closed | 18:32:21 | |
| Rcvd-Closed | 25:33 | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| T177 | Jolivette, Julio | | | 18:07:01 | 18:32:21 | N/A | N/A | 25:20 | 25:20 |

**Incident Comments**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

HSK-SYS-0027

| SAN MATEO POLICE DEPARTMENT | Page 1 |
|---|---|
| **CAD INCIDENT REPORT**<br>**2305080143** | 07/27/2023 |

| Location<br>HILLSDALE MALL, 1 HILLSDALE MALL | Cross Streets<br>S EL CAMINO REAL | City<br>SAN MATEO |
|---|---|---|

| Incident Type<br>CIVIL - CIVIL PROBLEM/ADVICE | | Call Taker<br>WHITE, AMY | Dispatcher<br>LEUNG, DENNIS |
|---|---|---|---|

| Date<br>05/08/2023 | Priority | Primary Unit<br>C22 | Beat<br>C | Fire Zone | Area<br>34 | Map | Source<br>TELEPHONE CALL |
|---|---|---|---|---|---|---|---|

| Caller Name | | Caller Address | | Caller Phone |
|---|---|---|---|---|

| Dispositions<br>Completed | | Weapon | Alm Level | Case Number |
|---|---|---|---|---|

| Vehicles | Associated Incidents |
|---|---|

**Incident Times**
| Received | 18:35:07 |
|---|---|
| Created | 18:38:13 |
| Dispatched | 18:40:45 |
| En Route | |
| On Scene | 18:51:39 |
| Closed | 19:05:11 |
| Rcvd-Closed | 30:04 |

| Special Circumstances |
|---|

| Persons | Sex | DOB | Race | DL |
|---|---|---|---|---|

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| C22 | K. Quinlan/Z. K9 | 18:40:45 | | 18:51:39 | 19:05:11 | 10:54 | N/A | 13:32 | 24:26 |
| C174 | Moniz Jr, Mark | 18:40:46 | | 18:51:42 | 19:04:32 | 10:56 | N/A | 12:50 | 23:46 |

**Incident Comments**

WMA EARLY 40YRS BLOND HAIR/SUNGLASSES/ BLU JACKET/BLU JEANS - REFUSES TO REMOVE HIS ROLLER
BLADES WHILE INSIDE THE DINING TERRACE - RP WOULD LIKE ASST REMOVING HIM FROM PROPERTY AND
/OR ISSUING 602 NOTICE

CONTROLLED DOCUMENT - DO NOT DUPLICATE

HSK-SYS-0028

EXHIBIT M (HSK-SYS-0029—0049)

**Plaintiff San Mateo Superior Court Complaint**

Plaintiff meticulously put together this case to finally get a chance to obtain a restraining order for the use of his prosthesis. However, he was unable to explain that in 2014 he was allowed in by virtue of the vendor complaint on San Mateo Event Center letterhead. The San Mateo County Fair was ending in 2 days and I had just enough time to get an ex-parte pleading together. The history of San Mateo Event Center, shown by these exhibits demonstrate that the Judge plausibly would have allowed me in on the merits.

The police report states a Disturbance for trying to enter San Mateo County Fair with prosthetic skates, where 5 officers arrive harassing disabled Plaintiff.

San Mateo Event Center 2014 Note Transcribed:

Rollerskates as  Wheelchair

Security denied access into ?(guarded area that they let me in)?

Troy went to art exhibit, Man came up to gentleman saying he couldn't wear skates.

Man states if he breaks it he bought it.

This is an ADA complaint against vendor, not San Mateo Event Center.



**FILED**

SAN MATEO COUNTY

JUN 0 6 2025

Clerk of the Superior Court

By _____
DEPUTY CLERK

michael Troy Wilkes
2201 Bridgepointe PKwy C246
Foster City CA 94404

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

**25CIV04282**

MICHAEL TROY WILKES,

    Plaintiff,

    v.

SAN MATEO COUNTY EVENT CENTER (AKA SAN MATEO COUNTY FAIR), SAN MATEO POLICE DEPARTMENT, 888 SAN MATEO, SAN MATEO SUPERIOR COURT SHERIFF'S DEPUTY DOE, AIRBNB INC., BAY AREA RAPID TRANSIT (BART), CALTRAIN, UNITED AIRLINES, DOE ENTITIES 1-25,

    Defendants.

Case No: _____

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** (Violations of ADA Title I, II, III, V; Unruh Civil Rights Act; Section 504; Declaratory and Injunctive Relief)

**RECEIVED**

JUN 0 6 2025

CLERK OF THE SUPERIOR COURT
SAN MATEO COUNTY

HSK-SYS-0030

·25CIV04282

INDEX OF AUTHORITIES

Cases

CA *DMV Driver Safety v. Wilkes*,
DL No. B3735242 (DMV Licensing and Operations Division May 23, 2022) (*HANDICAPSKATER Driving Accommodation* https://handicapskater.com/common/doc/HandicapSkater-Driving-Accommodation-Pleading.pdf) ........................................................................................................................................ 4

*San Mateo County Transit Police v. Wilkes*,
No. 428023 (San Mateo Superior Court Sep. 28, 2005) (*Discrimination of HANDICAPSKATER Accessibility* https://handicapskater.com/common/doc/HandicapSkater-Pleading.pdf) ....................................................... 4

2

HSK-SYS-0031

1    I. INTRODUCTION

2    Plaintiff, Michael Troy Wilkes referred to as Mr. Wilkes, brings this action for systemic discrimination based on a

3    disability involving repeated denials of access, retaliation, and harassment for the medically necessary use of inline

4    skates as a prosthetic mobility aid. These discriminatory acts span over 20 years, implicating federal and state rights

5    under:

6         Title I of the Americans with Disabilities Act (employment-related discrimination)

7         Title II (public entities and transportation)

8         Title III (places of public accommodation)

9         Title V (retaliation, coercion, and threats)

10        California Unruh Civil Rights Act (Civil Code § 51)

11        Section 504 of the Rehabilitation Act

12

13   II. JURISDICTION AND VENUE

14   Jurisdiction is proper under the Constitution and laws of California, including Government Code § 11135 and Civil

15   Code § 51. Venue is proper in this court because Defendants reside or conduct business in San Mateo County and

16   the discriminatory incidents occurred therein.

17

18   III. PARTIES

19   Plaintiff, Mr. Wilkes, is a resident of San Mateo County, California. He uses prosthetic inline skates in lieu of a

20   wheelchair due to a disabling pelvic injury.

21   Defendants include:

22        San Mateo Event Center, for denying past access and threatening future exclusion.

23        San Mateo Police Department, for repeated refusal to recognize ADA-compliant prosthetic use, including

24        false statements to the DMV.

25        888 San Mateo, for refusing access and instigating legal proceedings (Case #22-CLJ-03788).

26        AirBnB, for Title I employment and accommodation denials.

27        CalTrain/BART, for the foundational discrimination beginning in 2003, leading to a federal mandate in

28        2007 for ParaTransit access.

3

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (VIOLATIONS OF ADA TITLE I, II, III, V;
UNRUH CIVIL RIGHTS ACT; SECTION 504; DECLARATORY AND INJUNCTIVE RELIEF)

25CIV04282

1    United Airlines, for unjust refusal of access with prosthetic skates despite prior compliant flights with

2    Delta.

3    San Mateo Superior Court Sheriff's Deputy Doe, for harassing conduct at courthouse.

4

5    IV. FACTUAL BACKGROUND AND EXHIBITS

6    1.    **CalTrain Refusal and Initial Civil Disobedience**

7    Video: https://youtu.be/HFREnYEDp7Y?si=WxHqhFuqi8AuC0iJ

8    Legal Pleading: https://handicapskater.com/common/doc/HandicapSkater-Pleading.pdf

9    Result: 2007 Department of Transportation Ruling: https://www.transit.dot.gov/regulations-and-guidance/civil-

10   rights-ada/bay-area-rapid-transit-district-san-francisco-ca-10-15-07

11   2.    **San Mateo County Fair (2014–2025)**

12   Video of most recent incident: https://youtu.be/EijkC5dXRj0?si=1ObPgN0dUaCSEfg0

13   Plaintiff was granted entry, then told by supervisor he would not be allowed in future due to prosthetic skates,

14   contradicting ADA and Fair's own 2014 acknowledgment (Exhibit 1).

15   3.    **San Mateo Police Report and DMV Letter**

16   SMPD was called for an incident in 2022, when I was not allowed in the San Mateo Fair. The Police incident

17   report uses disinformation to characterize the incident as a disturbance, rather than a Civil Rights violation

18   (Exhibit 2). Furthermore, 1 of the 5 officers confiscated my mobility cane while interrogating me, another Civil

19   Rights violation, and SMPD refused to provide the police body camera footage (Exhibit 3, 4).

20   DMV Accommodation Pleading: https://handicapskater.com/common/doc/HandicapSkater-Driving-

21   Accommodation-Pleading.pdf

22   DMV Reinstatement with Prosthetic Notation: https://handicapskater.com/common/doc/DMV-

23   LicenseReinstatement.pdf

24   4.    **888 San Mateo (Case #22-CLJ-03788)**

25   Landlord refused to honor Plaintiff's ADA accommodation, leading to retaliatory legal action and court

26   dismissal without prejudice. Plaintiff was harassed by courthouse deputy during attendance.

27   5.    **Airbnb Title I Violation**

28

4

HSK-SYS-0033

25CIV04282

1   Refusal to accommodate prosthetic device in employment/housing context, described in full at

2   https://handicapskater.com/common/DFEH%20-%20AirBnB%20Summary.html

3   6.      **United Airlines**

4   Denied boarding due to prosthetic skates, contradicting previous successful flights with Delta Airlines.

5

6   V. LEGAL CLAIMS

7       1. Violation of Title I – AirBnB

8       2. Violation of Title II – CalTrain, BART, SamTrans, Public Transit, DMV, SMPD

9       3. Violation of Title III – San Mateo County Fair/Event Center, 888 San Mateo, United Airlines

10      4. Violation of Title V – Retaliation, Intimidation, and Coercion by Police, Landlord, Airline Staff

11      5. Violation of California Unruh Civil Rights Act

12      6. Injunctive Relief – Immediate order allowing entry to the San Mateo Event Center with prosthetic skates

13      7. Declaratory Relief – Formal recognition of skates as a valid prosthetic mobility device.

14

15  VI. PRAYER FOR RELIEF

16  Plaintiff seeks:

17      Temporary Restraining Order against San Mateo Event Center to attend the Fair ending this weekend

18      General and compensatory damages

19      Statutory damages under the Unruh Act ($4,000+ per incident)

20      Declaratory relief affirming prosthetic status

21      Costs of suit

22      Any further relief the Court deems just and proper

23

24  I have spent over 20 years using, refining, and proving the use of skates as a prosthetic device for a ballistic mobility

25  impairment. This pleading describes the systemic nature that discriminates against me as addressed on my website,

26  https://HandicapSkater.com.

27

28

5

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (VIOLATIONS OF ADA TITLE I, II, III, V;
UNRUH CIVIL RIGHTS ACT; SECTION 504; DECLARATORY AND INJUNCTIVE RELIEF)

25CIV04282

1 | **DATED** this 5th day of June 2025.

2

3

4 | Michael "Troy" Wilkes
Pro Se Litigant
5 | 2201 Bridgepointe Pkwy, C246, Foster City, CA, 94404
(650) 678-0502
6 | handicapskater@mindspring.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (VIOLATIONS OF ADA TITLE I, II, III, V;
UNRUH CIVIL RIGHTS ACT; SECTION 504; DECLARATORY AND INJUNCTIVE RELIEF)

Exhibit 1


SanMateo CountyFair

## 2014 San Mateo County Fair
## Guest Comment Form

Name: Tru Wikes
Address: 888 north San Mateo dr. #A 105 San Mateo, 94401
Phone #: 650-678-0502
E-mail: rollernauta me.com

Comment: Uses
Rollerskates as a wheelchair
security denied access into grand c. Tuguthimi
Tru went to art exhibit, Man came up
to gentleman sayins he couldnt wear skates.
man state if he brakes it he bovght it.
This is an ADA complaint agam against
vendor. Not San Mateo Cunty Event Center.

Date of Incident: 6/12/14
Time of Incident: 2:50pm
Taken By:

HSK-SYS-0036



| SAN MATEO POLICE DEPARTMENT | Page 1 |
|---|---|
| CAD INCIDENT REPORT | 06/14/2022 |
| 2206110117 | |

| Location | Cross Streets | City |
|---|---|---|
| SAN MATEO EVENT CENTER-ADMIN OFFICES, 2495 S DELAWARE ST | E 25TH AV/E 28TH AV | SAN MATEO |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| 415 - DISTURBANCE | BARROS, ASHLEY | LEUNG, SAMANTHA |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 06/11/2022 | | C205 | C | | 31 | | TELEPHONE CALL |

| Caller Name | | Caller Address | | Caller Phone |
|---|---|---|---|---|

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Completed-Must add notes, Completed-Must add notes | | | |

| Vehicles | Associated Incidents |
|---|---|

| Incident Times | | Special Circumstances | | | | |
|---|---|---|---|---|---|---|
| Received | 11:32:42 | | | | | |
| Created | 11:34:28 | Persons | | Sex DOB | Race | DL |
| Dispatched | 11:35:35 | | | | | |
| En Route | 11:35:40 | | | | | |
| On Scene | 11:41:15 | | | | | |
| Closed | 11:57:38 | | | | | |
| Revd-Closed | 24:56 | | | | | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| C205 | Goodman, Dupra | 11:35:35 | 11:35:40 | 11:41:15 | 11:57:38 | 05:40 | 05:35 | 16:23 | 22:03 |
| D198 | Calfagy, Ryan | 11:35:38 | 11:35:40 | | 11:36:22 | N/A | N/A | N/A | 00:44 |
| G76 | Basurto, Jaime | 11:36:16 | 11:36:25 | 11:41:43 | 11:53:43 | 05:27 | 05:18 | 12:00 | 17:27 |
| G161 | Han, Edward | 11:36:19 | 11:36:22 | 11:41:35 | 11:57:38 | 05:16 | 05:06 | 16:03 | 21:19 |
| G206 | Thielmann, Zachary | 11:37:20 | 11:37:26 | 11:41:40 | 11:50:47 | 04:20 | 04:14 | 09:07 | 13:27 |
| G213 | Mitchell, Melissa | 11:37:20 | 11:37:23 | 11:41:37 | 11:50:45 | 04:17 | 04:14 | 09:08 | 13:25 |

Incident Comments
GATE #1 THERE IS A PATRON TRYING TO GET INTO THE FAIR ON ROLLER BLADES
CURRENLTY W FAIR STAFF, STARTING TO YELL AND THREATEN PEOPLE - RP DIDNT HAVE ANYTHING
FURTHER.

CONTROLLED DOCUMENT - DO NOT DUPLICATE

Exhibit 3

**From:** San Mateo Public Records Center sanmateoca@mycusthelp.net
**Subject:** Public Records Request :: W006430-061322
**Date:** June 13, 2022 at 1:31 PM
**To:** rollernaut@me.com



Thank you for your interest in public records of the City of San Mateo. Your request was received by the City of San Mateo on 6/13/2022 and given the reference number W006430-061322 for tracking purposes.

Record(s) Requested: SMPD arrived at the San Mateo County Fair, where they refused entry with my specialty wheelchair and filed an incident report. I need the incident report and body camera footage of all 5 officers. This is for an ADA complaint and non-compliance from your department will mean that I have to submit an ADA violation against you.

The request is being forwarded to appropriate department(s) for processing.

Monitor request progress at the link below. The City will email you when the request is complete. Thank you for using the San Mateo Records Center.

To monitor the progress or update this request please log into the San Mateo Records Center.

HSK-SYS-0038

Exhibit 4



**San Mateo Police Department**
Field Operations Division

200 Franklin Parkway
San Mateo, California 94403-1497

June 15th, 2022

Michael Wilkes
rollernaut@me.com

Re: PRA-W006430-061322

Mr. Wilkes:

This letter is in written response to your request for public records under the California Records Act, which requested the following:

*"SMPD arrived at the San Mateo County Fair, where they refused entry with my specialty wheelchair and filed an incident report. I need the incident report and body camera footage of all 5 officers. This is for an ADA complaint and non-compliance from your department will mean that I have to submit an ADA violation against you."*

In accordance with California Government Code Section 6253, a legal review of your request was completed, with the following determinations:

1.  In regards to the incident report, we have attached the CAD Incident Report (#2206110117) to this response in GovQA.
2.  In regards to the body camera footage, the City has determined that the body worn camera recording you are seeking is not subject to disclosure under the provisions of Government Code section 6254(f) because it is an investigative record of the SMPD.
    a.  Section 6254(f) provides that public agencies need not disclose records of investigations conducted by police agencies.
    b.  Pursuant to Government Code Section 6253(d), you are informed the persons responsible for the denial of your request for records are Bahareh Abdollahi, Assistant City Attorney and myself.

HSK-SYS-0039

If you have any questions or concerns about this response, please feel free to contact myself or Bahareh Abdollahi, City Attorney.

Sincerely,

*A23*

Matt Lethin
Captain
Field Operations Division
San Mateo Police Department
200 Franklin Pkwy
San Mateo, CA 94403
(650) 522-7663

HSK-SYS-0040

 **ChatGPT**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN MATEO**

**EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff: MICHAEL TROY WILKES
Defendants: SAN MATEO COUNTY EVENT CENTER (AKA SAN MATEO COUNTY FAIR), et al.
Case No: _____

---

## I. EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

Plaintiff respectfully applies for an **Ex Parte Temporary Restraining Order (TRO)** to enjoin Defendant **San Mateo County Event Center**, including its staff, security, and contractors, from denying Plaintiff access to the San Mateo County Fair with his **prosthetic mobility aid: inline skates**, as explicitly recognized by prior federal rulings (DOT 2007), medical necessity, and DMV reinstatement rulings.

This order is necessary to prevent irreparable harm to Plaintiff's civil rights and ability to engage in a public accommodation during the remaining days of the Fair, which ends this weekend.

---

## II. FACTUAL BASIS

- Plaintiff has previously received written acknowledgment (2014) allowing entry to the Fairgrounds with his skates as a mobility aid.
- On June 4, 2025, Plaintiff was stopped by a Fair Supervisor and San Mateo police officerswho stated he would not be allowed future entry despite having been let in that day.
- This incident was recorded and published at: https://youtu.be/EijkC5dXRj0?si=1ObPgN0dUaCSEfg0
- Prior rulings by the U.S. Department of Transportation (2007) and California DMV (2022) have established the legitimacy of Plaintiff's use of skates as a prosthetic mobility device.
- Plaintiff faces ongoing retaliation under ADA Title V, and the chilling effect of law enforcement threats.

---

## III. LEGAL BASIS

This TRO is warranted under: - **ADA Title III** (public accommodations) - **California Unruh Civil Rights Act** (minimum statutory damages and injunctive relief) - **California Code of Civil Procedure § 527** (TRO requirements)

Plaintiff demonstrates: 1. **Likelihood of success on the merits** – supported by video, precedent rulings, and medical necessity. 2. **Irreparable harm** – denial of civil rights and imminent exclusion from a time-limited public event. 3. **Balance of equities** – favors Plaintiff who seeks only non-discriminatory access. 4. **Public interest** – enforcement of ADA and civil rights statutes.

1

## IV. PRAYER FOR RELIEF

Plaintiff respectfully requests: - A **Temporary Restraining Order** preventing Defendants from denying Plaintiff access to the San Mateo County Fair based on use of his prosthetic inline skates. - That this TRO remain in effect until a preliminary injunction hearing can be held. - Any further equitable relief the Court deems just.

## V. PROPOSED ORDER

**[Attached: Proposed Order Granting TRO]**

DATED: June 5, 2025
Respectfully submitted,

**Michael "Troy" Wilkes**
Pro Se Litigant
2201 Bridgepointe Pkwy, C246
Foster City, CA 94404
(650) 678-0502
handicapskater@mindspring.com

2

HSK-SYS-0042

**DECLARATION OF MICHAEL TROY WILKES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**

I, Michael Troy Wilkes, declare as follows:

1. I am the Plaintiff in this action. I make this declaration in support of my Ex Parte Application for a Temporary Restraining Order against the San Mateo County Event Center, also known as the San Mateo County Fair.

2. I am a resident of San Mateo County, California, and I use medically necessary inline skates as a prosthetic mobility device due to a disabling pelvic injury that prevents me from walking without severe pain.

3. On multiple occasions spanning over two decades, including incidents at CalTrain (2003), 888 San Mateo (2022), United Airlines (2025), and most recently at the San Mateo County Fair in June 2025, I have been denied access, harassed, or retaliated against for my use of prosthetic skates.

4. On the most recent occasion, I was allowed entry into the Fairgrounds using my prosthetic skates, but upon exiting I was stopped by security and a supervisor who told me that I would not be allowed back in with my skates in the future. San Mateo police officers were called, and one stated that my skates were not considered a prosthetic, directly contradicting existing rulings and accommodations from the Department of Transportation (2007) and the California DMV (2022).

5. A video recording of this incident is available at:
https://youtu.be/EijkC5dXRj0?si=1ObPgN0dUaCSEfg0.

6. The San Mateo County Fair ends this weekend. If I am not granted immediate relief by the Court, I will be permanently deprived of the opportunity to participate in a significant community event solely due to the discriminatory denial of my medically necessary accommodation. Two years ago I was refused entry and last year I did not even try.

7. I respectfully request the Court grant a Temporary Restraining Order enjoining the San Mateo County Event Center and its staff from denying me access based on my use of prosthetic skates.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 5, 2025, at Foster City, California.

Michael Troy Wilkes

## [PROPOSED] TEMPORARY RESTRAINING ORDER

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN MATEO

MICHAEL TROY WILKES,

Plaintiff,

v.

SAN MATEO COUNTY EVENT CENTER (AKA SAN MATEO COUNTY FAIR), et al.,

Defendants.

Case No: _____

### [PROPOSED] TEMPORARY RESTRAINING ORDER

1. Having reviewed the Plaintiff's Ex Parte Application for a Temporary Restraining Order, supporting declaration, and evidence including prior Department of Transportation and DMV rulings, the Court finds as follows:

- Plaintiff has demonstrated a high likelihood of success on the merits of his claims under the Americans with Disabilities Act (ADA), the Unruh Civil Rights Act, and California disability access law.
- Plaintiff will suffer irreparable harm if denied access to a time-sensitive public accommodation, specifically the San Mateo County Fair, which concludes this weekend.
- The balance of equities favors Plaintiff and enforcement of civil rights.
- The public interest supports issuance of this TRO to uphold ADA protections and deter further discriminatory conduct.

### IT IS HEREBY ORDERED THAT:

Defendant SAN MATEO COUNTY EVENT CENTER, including any agents, security staff, or affiliated personnel, is restrained and enjoined from denying Plaintiff, MICHAEL TROY WILKES, access to the San Mateo County Fair or any event hosted on its premises based on Plaintiff's medically necessary use of inline skates as a prosthetic mobility device.

This order shall remain in effect until further order of this Court, or upon hearing and ruling on Plaintiff's request for a preliminary injunction.

### IT IS FURTHER ORDERED THAT:

Defendants shall show cause at a hearing on a date to be set by this Court why a preliminary injunction should not be issued.

IT IS SO ORDERED.

DATED: _____

_____

JUDGE OF THE SUPERIOR COURT

HSK-SYS-0045

# CM-010 - CIVIL CASE COVER SHEET

CASE TITLE: Michael Troy Wilkes v. San Mateo County Event Center, et al.

CASE NUMBER: _____

1. CASE TYPE: (Check one box below that best describes this case)

[ ] Auto Tort
[ ] Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death)
[ ] Contract
[ ] Collections
[ ] Insurance Coverage
[ ] Real Property

[X] Civil Rights (e.g., discrimination, false arrest) – Type: ADA Title I-V, Unruh Act

2. This case is:
[X] Unlimited (amount demanded exceeds $25,000)
[ ] Limited (amount demanded is $25,000 or less)

3. Filing Type:
[X] Original Complaint
[ ] Amendment to Complaint
[ ] Cross-Complaint
[ ] Other (specify): _____

4. Remedies sought (check all that apply):
[X] Monetary
[X] Nonmonetary; declaratory or injunctive relief
[ ] Punitive

5. Number of causes of action: 7

 - ADA Title I
 - ADA Title II
 - ADA Title III
 - ADA Title V
 - Unruh Civil Rights Act
 - Injunctive Relief
 - Declaratory Relief

6. This case:
[X] is not complex under rule 3.400 of the California Rules of Court
[ ] is complex – please complete form CM-110

Date: June 5, 2025

Signature: _____

Michael Troy Wilkes, Pro Se

HSK-SYS-0047

Michael Troy Wilkes
2201 Bridgepointe Pkwy, Apt C246
Foster City, CA 94404
(650) 678-0502
HandicapSkater@mindspring.com



**FILED**
SAN MATEO COUNTY

**JUN - 6 2025**

Clerk of the Superior Court
By_____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

MICHAEL TROY WILKES,

    Plaintiff,

vs.

SAN MATEO COUNTY EVENT CENTER

    Defendant(s).

Case No.: 25-CIV04282

[PROPOSED] TEMPORARY RESTRAINING ORDER

[PROPOSED] TEMPORARY RESTRAINING ORDER

1.  Having reviewed the Plaintiff's Ex Parte Application for a Temporary Restraining Order, supporting

declaration, and evidence including prior Department of Transportation and DMV rulings, the Court finds as

follows:

Plaintiff has demonstrated a high likelihood of success on the merits of his claims under the Americans with

Disabilities Act (ADA), the Unruh Civil Rights Act, and California disability access law.

Plaintiff will suffer irreparable harm if denied access to a time-sensitive public accommodation, specifically the

San Mateo County Fair, which concludes this weekend.

The balance of equities favors Plaintiff and enforcement of civil rights.

The public interest supports issuance of this TRO to uphold ADA protections and deter further discriminatory

conduct.

IT IS HEREBY ORDERED THAT:

Defendant SAN MATEO COUNTY EVENT CENTER, including any agents, security staff, or affiliated

personnel, is restrained and enjoined from denying Plaintiff, MICHAEL TROY WILKES, access to the San Mateo

[PROPOSED] TEMPORARY RESTRAINING ORDER - 1

1  County Fair or any event hosted on its premises based on Plaintiff's medically necessary use of inline skates as a

2  prosthetic mobility device.

3          This order shall remain in effect until further order of this Court, or upon hearing and ruling on Plaintiff's

4  request for a preliminary injunction.

5  IT IS FURTHER ORDERED THAT:

6          Defendants shall show cause at a hearing on a date to be set by this Court why a preliminary injunction

7  should not be issued.

8

9  IT IS SO ORDERED.

10

11          DATED: _____

12

**DENIED**

13          _Denied_____

14                        JUDGE OF THE SUPERIOR COURT

15          _Failed To Give Notice_

16          _of ex parte Application_

17          _So hearing Nor set on Prelimin_

18          _Injunction_

19          _Request for Temporary_

20          _Restraining order denied on_

21          _Merits & based on lack_

22          _of Notice_

23

24

25

26

27

28
                [PROPOSED] TEMPORARY RESTRAINING ORDER - 2

EXHIBIT N (HSK-SYS-0050)

**RediWheels Disability Obstacle Course**

This picture came up on a facebook memory, originally took place in ~2007. It demonstrates the disability obstacle course that RediWheels evaluates you. However, for my prosthetic skates they verified I could complete the course to grant access.

 **Troy Wilkes**
Apr 28, 2014 · Hillsborough · 👥

FWIW, This is the facility where the disabled must prove that they are not capable of using Public Transit and thus gain access to Paratransit. However, for me using skates, I had to prove that I could navigate it for Paratransit access, since they unconstitutionally refuse Public Transit access for me.



EXHIBIT O (HSK-SYS-0051—0053)

**Employment Documents Showing Success and Discrimination**

Two documents show how the Plaintiff released liability to gain access on the job with his prosthesis. JobTrain apologizing for misunderstanding Plaintiff's prosthesis.



# **CISCO SYSTEMS**    **Cisco HandicapSkater Disability Agreement: Individuals**

Troy Wilkes
338 South Fremont St #221
San Mateo, CA 94401
Cell: (650) 678-0502
Email: HandicapSkater@mindspring.com
Web: http://www.HandicapSkater.com

Dear Mr. Wilkes:

*This agreement (the "Agreement") is entered into by and between Cisco Systems, Inc. ("Cisco"), Strataserv, Inc. ("Strataserv") and Troy Wilkes ("Individual") in consideration of the Individual's ballistic mobility impairment ("Disability") (Cisco and Strataserv will collectively be referred to hereinafter as the "Company"). This will confirm that the Company has agreed to accommodate your disability by allowing you to rollerblade on their premises, something that other persons are not allowed to do. Your right to rollerblade on their premises is subject to your agreement to the following understandings and conditions:*

1. You must conduct yourself in a safe and responsible manner at all times, taking into account that all other persons are walking and you must limit your speed and movement accordingly.

2. When moving from one floor to another on the Company's premises, you should use an elevator (rather than an escalator or stairs) whenever possible in order to minimize the risk of injury to yourself and others.

3. While you are on the Company's premises, you agree to wear a visible handicap sign on your rollerblades confirming your right to rollerblade on the Company's premises. This is actually for your benefit, since it will enable our security personnel to identify you as an authorized rollerblader. Without such a sign, they would constantly be stopping you to explain the Company's general policy on rollerblading.

4. You agree to release the Company from any and all liability for injuries you suffer while rollerblading on the Company's premises. The Company maintains their premises in a condition which is safe for persons who are walking or traveling in wheelchairs; you agree that this is an appropriate standard of care and you agree to assume the risk that there are unknown or unsuspected hazards on the Company's premises for rollerblades. In this regard, we encourage you to wear appropriate protective gear at all times (knee pads, elbow pads, wrist guards and helmet).

5. You agree to accept liability for and to hold the Company harmless for any injuries or damages you cause to persons or property while on the Company's premises. In this regard, we encourage you to obtain homeowners insurance or some other form of liability insurance, if you do not have it already.

6. The Company reserves the right to revoke this letter at any time if you fail to abide by these conditions or if we determine that this accommodation is unreasonable or poses a hardship for any reason.

If you are in agreement with the foregoing conditions, please sign below and return the original letter to the Company. Once you have returned the signed letter, you are authorized to begin rollerblading on the Company's premises.

If you have any remaining questions, feel free to contact the Company.

Sincerely,

I accept and agree to the foregoing conditions.

Dated: 6/21/2005

By: Troy Wilkes

*Troy Wilkes*

 **Visa HandicapSkater Disability Agreement: Individuals**

Troy Wilkes
338 South Fremont St #221
San Mateo, CA 94401
Cell: (650) 678-0502
Email: yogis@mindspring.com
Web: http://www.HandicapSkater.com

Dear Mr. Wilkes:

*This agreement (the "Agreement") is entered into by and between Visa, Inc. ("Visa"), Ness Technologies, Inc. ("Ness") and Troy Wilkes ("Individual") in consideration of the Individual's ballistic mobility impairment ("Disability") (Visa and Ness will collectively be referred to hereinafter as the "Company"). This will confirm that the Company has agreed to accommodate your disability by allowing you to skate on their premises, something that other persons are not allowed to do. Your right to skate on their premises is subject to your agreement to the following understandings and conditions:*

1. You must conduct yourself in a safe and responsible manner at all times, taking into account that all other persons are walking and you must limit your speed and movement accordingly.

2. When moving from one floor to another on the Company's premises, you should use an elevator (rather than an escalator or stairs) whenever possible in order to minimize the risk of injury to yourself and others.

3. While you are on the Company's premises, you agree to wear a visible handicap sign on your skates confirming your right to skate on the Company's premises. This is actually for your benefit, since it will enable our security personnel to identify you as an authorized skater. Without such a sign, they would constantly be stopping you to explain the Company's general policy on skating.

4. You agree to release the Company from any and all liability for injuries you suffer while skating on the Company's premises. The Company maintains their premises in a condition which is safe for persons who are walking or traveling in wheelchairs; you agree that this is an appropriate standard of care and you agree to assume the risk that there are unknown or unsuspected hazards on the Company's premises for skates. In this regard, we encourage you to wear appropriate protective gear at all times (knee pads, elbow pads, wrist guards and helmet).

5. You agree to accept liability for and to hold the Company harmless for any injuries or damages you cause to persons or property while on the Company's premises. In this regard, we encourage you to obtain homeowners insurance or some other form of liability insurance, if you do not have it already.

6. The Company reserves the right to revoke this letter at any time if you fail to abide by these conditions or if we determine that this accommodation is unreasonable or poses a hardship for any reason.

If you are in agreement with the foregoing conditions, please sign below and return the original letter to the Company. Once you have returned the signed letter, you are authorized to begin skating on the Company's premises.

If you have any remaining questions, feel free to contact the Company.

Sincerely,

I accept and agree to the foregoing conditions.

Dated: 6/26/2006

By: Troy Wilkes

*Troy Wilkes*

HSK-SYS-0052



JOB TRAINING THAT WORKS

FORMERLY OICW

Board of Directors

Chairman
John C. Lang

Robert Aprice
Sukhinder Singh Cassidy
Paul Chamberlain
Jorge del Calvo
Jim Flanagan
Clarence I. Ferguson Jr.
Richard Hanley
J. Scott Hanson
Vinod L. Hali
Rob Kramer
Wade W. Loo
Franciscs Miranda
Trevor Paglaife
Eric Renzetta
Jan Thompson
Tara VanDerveer
Issun Vi
Michael Williams

Strategic Advisory Committee

Chairman
Paul M. Cook

Frank Caufield, Co-Founder
Kleiner Perkins Caufield & Byers
Paul M. Cook, Co-Founder
Raychem Corporation
Susan Ford Dorsey, President
Sand Hill Foundation
William C. Edwards, Partner
Bryan Jr. Partners
Dick Gould, Director of Tennis
Stanford University
Ronnie Lott
NFL Hall of Fame
John Lilywhite, President
The Levinson Company
Duncan L. Matteson, Chairman
The Matteson Companies
Hon. Becky Morgan, President
Morgan Family Foundation
Dean Morton, Former COO
Hewlett Packard
Russell Pyne, Managing Director
Amaze Capital
John Sobrato, Chairman
Sobrato Companies
John Volkmann
Chairman & Founder
J. Volkmann & Associates, Inc.

Executive Director
Sharon A. Williams

March 1, 2012

To: Michael Troy Wilkes
Re: Access to JobTrain services

Dear Troy,

I was glad to be able to speak with you yesterday regarding your visit to JobTrain on February 10. I'm also glad that you were able to attend your EDD workshop that day.

I assure you that JobTrain is fully compliant with ADA requirements, and we are pleased to accommodate any individual's needs. As I expressed in our telephone conversation, I regret the manner in which you were questioned about your use of in-line skates in the building after your workshop.

I have reminded our staff about the procedure for reasonable accommodation requests, and I have copies of the documents you presented regarding your need to use your in-line skates. These documents are perfectly acceptable to us, and you are welcome to use the services of JobTrain or its partners at 1200 O'Brien Drive in Menlo Park anytime.

I look forward to meeting you the next time you're here, and JobTrain is happy to help with any of your job search or training needs.

Regards,

*Eric Forgaard*

Eric Forgaard
Director of Administrative Services
(650) 330-6416

1200 O'Brien Drive, Menlo Park, CA 94025
T (650) 330-6429  F (650) 330-6401  W JobTrainworks.org    AN AFFILIATE OF OIC OF AMERICA

HSK-SYS-0053

EXHIBIT P (HSK-SYS-0054—0055)

**Establishing Skates as a Prosthetic Device**

In 2000, Plaintiff began releasing public and private entities from liability in order to demonstrate safe operation of his prosthetic mobility aid—inline skates—under real-world conditions. By 2005, through repeated submission of physician letters and mobility-related documentation, Plaintiff established a pioneering protocol for non-traditional prosthetic acceptance. This protocol included medical verification of necessity, collaboration with a biomechanics expert specializing in skating mechanics, and real-time demonstrations of safe and stable operation. The model was designed to satisfy agency concerns about safety while fulfilling ADA mandates for reasonable accommodation. The Plaintiff's approach laid the groundwork for what would later be accepted, implicitly or explicitly, by multiple agencies as a de facto standard for prosthetic skating access in transportation, licensing, and public venue contexts.



Target Stores
33 South Sixth Street
P.O. Box 1392
Minneapolis, Minnesota 55440-1392

Telephone: (612) 304-5578
Facsimile: (612) 304-8309
E-Mail: Alex.Tselos@target.com

July 21, 2000

Mr. Troy Wilks
2205 Bridgepointe Pkwy #237
San Mateo, CA 94404-5017

     Re:    Target – San Mateo, CA (T-1127)

Dear Mr. Wilks:

    You have asked for permission to use your roller blades within the Target store at San Mateo, CA due to a disabling medical condition. In support of your request you have provided me with a letter from Susan Fullemann, M.D. as well as copy of your state vehicle registration indicating your disabled status.

    Based upon your presentation of these items to me, you are given permission to use your roller blades within the Target store so long as you (a) conduct yourself in a safe and responsible manner, (b) release Target from any responsibility for any injuries you receive in connection with your use of the roller blades and (c) accept responsibility for any damage or injuries you cause to third parties in connection with your activity within the store. Your use of your roller blades within the Target store will constitute agreement with the foregoing conditions.

    If you have any questions regarding this matter, please don't hesitate to contact me at (612) 304-5578 to discuss this matter.

               Sincerely,

               alexander Tselos / psm

               Alexander Tselos
               Corporate Counsel

AGT/agt
cc: Richard Guzinski (STL T-1122)

#53477 v1 - T. Wilks ADA Ltr. (San Mateo, CA)

A Division of the Dayton Hudson Corporation      Printed on recycled paper.    HSK-SYS-0054



*Burlingame Family Health*

*Susan Fullemann, M.D.*
*Medical Director*

*Jerry Warren, Ph.D.*
*Administrative Director*

1820 OGDEN DRIVE, 2ND FLOOR, BURLINGAME, CA 94010
**Thursday, May 12, 2005**   TEL. (650) 692-7202   FAX (650) 697-7059

To Whom It May Concern:

As the treating Physician for Troy Wilkes for the past 8 years, I have seen his ballistic mobility impairment progressively get worse. In 1997 after losing 2 jobs, Mr. Wilkes demonstrated his need for a handicap plate on his motorcycle to be able to park close enough to walk to his job. Subsequently under my care he has proactively done the following to limit stress in his pelvic and sacroiliac joint fractures:

1. Moved to residences with elevators instead of stairs.
2. Got rid of his car with manual transmission for an automatic transmission.
3. Limited ballistic activities (walking) by using non-ballistic movement (skating).
4. Established a wheelchair standard of use for skates in public accommodations.
5. Successfully used skates, while working, to do his job without any problems.
6. San Mateo Legal Aid Society requested reasonable accommodations from BART.

Furthermore, Mr. Wilkes has demonstrated his problems with wheelchairs and scooters backed by the testimony of a Biomechanics Expert, Andrew Mahar, MS, who has stated:

I feel that his [Troy's] use of skates to reduce pain and increase mobility has a credible biomechanical basis … the loads directed to the pelvis are less with the horizontal propulsion involving skates as compared to the vertical propulsion associated with walking/running … in the case of pelvic injuries, this [wheelchair use] is an inappropriate method of transportation. When using a wheelchair, the entire mass of the upper body (which accounts for almost 70% of total body mass) applies a direct and constant load through the sacroiliac joint into the pelvis. In this case, the loads are not impulsive but rather constant over time. The use of a wheelchair also provides little ability to alleviate these forces … After considering the biomechanics of skating, walking or using a wheelchair, I feel that the skating option provides the only reasonable method for limiting pain and increasing mobility.

I would also like to retract any conclusions that were drawn from correspondence with Mathew Sieger in 2001. Mr. Wilkes has provided adequate documentation to show he has progressively gotten worse and now uses his skates as a prosthetic device to correct his ballistic mobility impairment.

Sincerely,

Susan Fullemann, MD

JOSE J. SAN GABRIEL
Commission # 1428...
Notary Public - Coliforn...
San Mateo County
My Comm. Expires Jul 29, 2007

HSK-SYS-0055

EXHIBIT Q (HSK-SYS-0056—0065)

Pleading sent to United for Compliance

They ignored it and proceeded to refuse access during phone conversations. Plaintiff explicitly states why skates are necessary from the terminal in ~1999, boarding and traveling distances over 20 feet, including to use the lavatory during flights. Plaintiff has successfully done this since 2005 including April 2025 on Delta.

UNITED STATES DEPARTMENT OF TRANSPORTATION

AVIATION CONSUMER PROTECTION DIVISION

DISABILITY RIGHTS SECTION

| | |
|---|---|
| MICHAEL TROY WILKES, | FTA Complaint No. 06-0135 (October 15, 2007) |
| Plaintiff/Complainant, | |
| v. | HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT |
| UNITED AIRLINES, | |
| Defendant/Respondent | |

HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

1

1

## 1. INTRODUCTION AND BACKGROUND

2   1.1 This Complaint is submitted by Plaintiff/Complainant, **Michael Troy Wilkes** ("Mr. Wilkes"), to the Department

3   of Transportation ("DOT") under the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, and its implementing

4   regulations (14 C.F.R. Part 382). It is also submitted to the Department of Justice ("DOJ") under Titles II, III, and V

5   of the Americans with Disabilities Act ("ADA") to address systemic, ongoing discrimination faced by Mr. Wilkes

6   and similarly situated passengers with disabilities who rely on alternative mobility aids. I am the "[name withheld]"

7   individual specified in this website ruling skates must be accommodated for Mr. Wilkes's ballistic mobility

8   impairment: https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/bay-area-rapid-transit-district-

9   san-francisco-ca-10-15-07.

10

11   1.2 Mr. Wilkes alleges that **United Airlines** ("United") has engaged in discriminatory practices, failed to provide

12   reasonable accommodations, subjected him to humiliating treatment, and inflicted undue emotional distress. This

13   conduct violates the ACAA and the ADA by denying access to a mobility aid (inline skates used as a prosthetic

14   device, HSK-ACCS-026, HSK-ACCS-027, HSK-DMV-094) and imposing arbitrary restrictions not applied to

15   nondisabled passengers.

16

17   1.3 Mr. Wilkes further alleges that the discriminatory actions of United Airlines have caused him anguish and a loss

18   of dignity, compounding prior incidents of airline discrimination he experienced (including a 2011 event involving

19   United, a 2013 event involving Delta and a 1999 Spirit event).

20

21   ## 2. JURISDICTION AND LEGAL BASIS

22   ### 2.1 Air Carrier Access Act (ACAA)

23   • The ACAA (49 U.S.C. § 41705) and its implementing regulations (14 C.F.R. Part 382) prohibit discrimination by

24   air carriers against individuals with disabilities and require carriers to accommodate mobility aids.

25   • Under 14 C.F.R. § 382.3, the ACAA requires airlines to provide accommodations for **passengers with disabilities**,

26   including **mobility aids necessary for ambulation.**

27   14 C.F.R. § 382.7 prohibits airlines from refusing service based on disability.

28

HSK-SYS-0057

1   14 C.F.R. § 382.11 requires airlines to provide equivalent service for **passengers with disabilities** without

2   undue restrictions.

3   14 C.F.R. § 382.125 mandates that airlines accommodate **prosthetic and assistive devices**.

4   My skates are a **mobility aid under these regulations,** and United Airlines violated the ACAA by refusing to

5   accommodate my needs.

6

7   2.2 Americans with Disabilities Act (ADA)

8   • **Title II** prohibits discrimination by public entities. Mr. Wilkes invokes Title II to the extent that airport and other

9   transit-related facilities are operated under public authority or in conjunction with local agencies.

10   • **Title III** covers places of public accommodation and services operated by private entities. Airports and airline

11   terminals often qualify under Title III's broad scope for providing goods/services to the public.

12   • **Title V** covers miscellaneous provisions, which can include retaliation, coercion, or interference with ADA-

13   protected rights.

14

15   3. PARTIES

16   3.1 Plaintiff/Complainant:

17   • **Mr. Michael Troy Wilkes** is a passenger with a disability affecting his hip and pelvic region, diagnosed as a non-

18   functional body part (deformed pelvis/hip). Mr. Wilkes resides in Foster City, CA, and has extensively documented

19   his use of inline skates as a prosthetic mobility aid to mitigate severe pain when walking.

20

21   3.2 Defendant/Respondent:

22   • **United Airlines, Inc.** is an air carrier headquartered at Chicago, IL, subject to the ACAA and ADA Title III

23   obligations for providing nondiscriminatory service to individuals with disabilities.

24

25

26

27

28   HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

3

4. FACTUAL ALLEGATIONS

4.1 Use of Inline Skates as Prosthetic Device

• Due to a pelvic and hip deformity, Mr. Wilkes experiences severe pain-induced cardiovascular events ("PICE"s) when attempting to walk unassisted. Inline skates serve as his mobility aid, functioning as a prosthetic, mitigating high-impact forces that exacerbate his pain and intra-pelvic torsions inherent in ballistic motions such as walking.

4.2 Recent 2025 Incident

• On or about April 2, 2025, Mr. Wilkes was scheduled to travel on United Airlines flights (Nos. 1141, 4368, 4827, 2071) from San Francisco International Airport ("SFO") to Roanoke Regional Airport ("ROA") and returning April 6, 2025.

• Prior to departure, an Accessibility Desk representative ("Tee") refused to recognize Mr. Wilkes's skates as a valid mobility aid. Despite repeated attempts by Mr. Wilkes to clarify the skates' medical necessity—supported by physician documentation—United Airlines staff persisted in prohibiting use of his prosthesis.

• Airline personnel cited "DOT safety policy does not permit you to use inline skates as an assistive device while in the airport nor while on the aircraft", which was an arbitrary and discriminatory application of policy, failing to recognize inline skates as a valid mobility aid. San Francisco International Airport (SFO) has granted me access with my mobility aid since 2005.

• Mr. Wilkes spent significant time (approximately 8+? hours) on the phone with United, attempting to secure accommodations consistent with 14 C.F.R. Part 382. He was met with confusion, refusal to provide supervisory input, and no satisfactory resolution resulting in cancelling the scheduled trip (TODO: Transcribe audio recordings).

4.3 Pilot-Mandated Seat Change and Restriction

• On a prior United flight in 2011 (Exhibit HSK-ACAA-003), the pilot refused to depart until Mr. Wilkes relinquished his aisle seat and moved to the terrorist seat, a non-aisle seat in front of the lavatory. Mr. Wilkes was not permitted to stand or move about the cabin despite his documented need to occasionally adjust to mitigate pain and avoid PICEs. This incident caused humiliation, physical discomfort, and distress, showcasing a pattern of discriminatory treatment by United.

HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

4

1

2                4.4 Horrible Customer Service and Emotional Anguish

3  • In addition to the refusal of the prosthetic device, Mr. Wilkes was subjected to demeaning interactions with United

4  personnel, causing severe emotional distress.

5  • This trip, which was intended to be a return home after approximately 12 years since a similar discrimination event

6  by Delta, was marred by repeated acts of bias and barrier-laden "service."

7

8                4.5 Prior Legal Precedents and Accommodations

9  • Mr. Wilkes has secured prior rulings and accommodations allowing the use of inline skates in courthouses (San

10  Mateo and San Francisco Superior Courts) (Exhibits HSK-DMV-023, HSK-DMV-024).

11  • Ater 2 years of prosthesis discrimination (Exhibit HSK-ACCS-097), he began riding a motorcycle with skates for

12  his condition. However, in 2022, an SMPD police officer falsely ascribed him to not having control of his

13  motorcycle (Exhibit HSK-DMV-084). They have refused to provide the body camera footage after many requests

14  (Exhibits HSK-DMV-109 thru HSK-DMV-113).

15  • Ruling under the guidance of DoT-FTA and DoJ (Exhibit HSK-DMV-020/021) to allow his prostheses on

16  Paratransit.

17

18                4.6 Medical and Legal Documentation

19  • Exhibits included with this Complaint (e.g., physician letters, DOT/DOJ correspondence, DMV documentation,

20  references to paratransit letters) support Mr. Wilkes's ongoing need for inline skates as a legitimate and medically

21  essential mobility aid.

22  • The California DMV has officially recognized Mr. Wilkes's "skate-based mobility" and authorized him to drive

23  and ride motorcycles with said prosthetic (per a 2022 official licensing determination) (Exhibit HSK-ACAA-001).

24  • US DOJ Civil Rights (Exhibits HSK-DMV-014/015) is responsible for overseeing title II of the Americans with

25  Disabilities Act and Section 504 of the Rehabilitation Act.

26  • Mr. Wilkes used multiple instances of civil disobedience to establish skates as a prosthetic device, in his pleading

27  *Discrimination of HANDICAPSKATER Accessibility*, fusing the knowledge of a biomechanics engineer (Exhibit HSK-

28                HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

5

ACCS-046) and primary physician (Exhibit HSK-DMV-083) established precedent for defining a new mobility aid

(I am "[name withheld]" in this ruling: https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/bay-

area-rapid-transit-district-san-francisco-ca-10-15-07) and have the actual correspondence. The concept of using a

skating motion to compensate for walking is for the purpose of alleviating a PICE (Pain-Induced Cardiovascular

Event) indicated by HR (Heart Rate) zone uses data science to demonstrate ballistic vs non-ballistic motions:

https://public.tableau.com/app/profile/troy.wilkes/viz/MobilityAidAnalytics/Analytics. This demonstrates that

walking is not feasible.

To demonstrate the use of my skates as a mobility aid on public transportation, in 2003 I recorded these videos

skating through the airport, riding CalTrain, and riding CalTrain standing, respectively:

https://www.youtube.com/watch?v=Cfaz_AmTVD4&list=PL631EBFF68C67168C&index=6

https://www.youtube.com/watch?v=9JMYR5nHjhY&list=PL631EBFF68C67168C&index=5

https://www.youtube.com/watch?v=ohxdzD4y9_A&list=PL631EBFF68C67168C&index=6

Skate access granted in SM court (https://handicapskater.com/common/doc/HandicapSkater-SM-RA.pdf)

Skate access granted in SF court (https://handicapskater.com/common/doc/HandicapSkater-SF-RA.pdf)

DMV drive with skates (https://handicapskater.com/common/doc/DMV-LicenseReinstatement.pdf)

DOJ letter defining jurisdiction (https://handicapskater.com/common/doc/HandicapSkater-DOJ.pdf)

DOT-FTA letter to BART (https://handicapskater.com/common/doc/HandicapSkater-DOT-FTA.pdf)

HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

6

1    5. PRIOR INCIDENTS AND PATTERN OF DISCRIMINATION

2    5.1 2011 United Airline Incident

3    • As stated above (Section 4.3), United discriminated against Mr. Wilkes in 2011 by effectively confining him to a

4    seat near the lavatory and disallowing normal in-flight movement.

5

6    5.2 2013 Delta Airline Incident

7    • Approximately 12 years prior to 2025 (i.e., around 2013 or earlier), Delta Airlines engaged in similar

8    discriminatory conduct. Mr. Wilkes references that experience to illustrate a pattern of airlines mischaracterizing or

9    outright refusing his mobility aid.

10

11    5.3 1999 Spirit/Frontier Airline Incident

12    • Around 1999 Mr. Wilkes endured a painful and humiliating experience traveling from SFO to Denver International

13    Airport ("DOA") for a couple day seminar. On the return flight Spirit had a delay, where he had to walk large

14    distances back and forth between check-in points causing severe pain. The boarding agents were rude and

15    discriminatory leading to a very unfavorable experience.

16

17    5.4 2006 Alaska Airlines Incident

18    • On April 21, 2006, Mr. Wilkes flew from San Francisco to Seattle on Southwest airlines using his prosthesis

19    without any problem for an 8 hour interview. At the conclusion, Mr. Wilkes was confronted on his return flight

20    (HSK-ACAA-002) by the flight attendants stating the pilot would not allow him to use his prosthesis. After much

21    consternation providing his Dr prescription, the pilot and attendant relented allowing Mr. Wilkes to return home.

22

23    5.5 Systemic Barriers

24    • Mr. Wilkes alleges that these incidents demonstrate a systemic lack of recognition or training regarding alternate

25    prosthetic devices under the ACAA and ADA. Airlines, including United, continue to impose arbitrary restrictions

26    on the disabled with valid medical needs, causing repeated harm.

27    • Mr. Wilkes alleges that systemic discrimination is further exemplified by Title II, III and V violations of the ADA.

28    HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

7

## 6. CAUSES OF ACTION

### 6.1 Violation of the Air Carrier Access Act (49 U.S.C. § 41705)

**6.1.1 Failure to Provide Reasonable Accommodation**

• United's refusal to acknowledge and accommodate inline skates as a mobility aid—functionally a prosthetic device—violates 14 C.F.R. § 382.11 (prohibiting discrimination) and § 382.125 (requiring acceptance of prosthetic devices).

**6.1.2 Arbitrary and Discriminatory Application of Policy**

• United personnel wrongly invoked "safety policy" without justification or individualized assessment, in violation of 14 C.F.R. § 382.7 and 14 C.F.R. § 382.3, each of which compels airlines to avoid blanket bans on mobility aids.

### 6.2 Violation of the Americans with Disabilities Act (ADA)

**6.2.1 Title II & Title III – Public Entities and Public Accommodations**

• Airlines operate within terminals, which often fall under state, local, or port authority jurisdiction (Title II) and must comply with public accommodation standards in providing services to passengers (Title III). Denying Mr. Wilkes the use of his mobility aid contravenes the ADA's mandate to provide equal access.

**6.2.2 Title V – Retaliation, Coercion, Interference**

• By subjecting Mr. Wilkes to humiliating conditions, restricting his movement under threat of canceling or delaying a flight, and disregarding or penalizing his need for an assistive device, United has interfered with his ADA-protected rights.

**6.2.3 Systemic and Ongoing Discrimination**

• The 2011 and 2025 United incidents evidence a pattern of discriminatory treatment and establish that United has failed to remedy or address the underlying lack of training or policies that would prevent further violations.

HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT

8

1  • The systemic discrimination was demonstrated in 2007 with the DOT ruling about my skates giving me paratransit
2  access after 17 years of refusing any reasonable accommodation. BART used disinformation to limit accessibility
3  with this reasonable accommodation enacted 17 years after the initial refusal by CalTrain in 1991. I address this in a
4  systemic discrimination pleading forthcoming.
5  https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/bay-area-rapid-transit-district-san-francisco-
6  ca-10-15-07
7
8               7. REQUESTED RELIEF AND REMEDIES
9  Mr. Wilkes respectfully requests that the Department of Transportation, the Department of Justice, and any other
10  relevant agencies or courts:
11               7.1. Issue a Finding of Violation
12  • Determine that United Airlines violated the ACAA and/or ADA by refusing to accommodate and by
13  discriminating against Mr. Wilkes.
14               7.2. Order Corrective Actions and Policy Revisions
15  • Mandate that United Airlines revise its policies, training, and procedures to recognize inline skates (or similar
16  devices) as a valid prosthesis or mobility aid where medically necessary, consistent with 14 C.F.R. Part 382 and the
17  ADA.
18  • Require updated training for flight crews, gate agents, and supervisors on handling passengers with non-traditional
19  but legally protected mobility aids.
20               7.3. Compensation and Damages
21  • Award damages for emotional distress, humiliation, wasted time, and any out-of-pocket losses resulting from
22  United's refusal to accommodate Mr. Wilkes's disability.
23  • Provide additional compensation for the systemic denial of rights over multiple incidents, including the 2011
24  flight, and any punitive or exemplary damages deemed appropriate.
25               7.4. Declaratory Relief
26  • Declare that inline skates, when prescribed or medically necessary to mitigate pain and allow ambulation, must be
27  permitted under the ACAA and ADA.
28               HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT
9

7.5. Injunctive Relief

• Enjoin United Airlines from continuing to enforce any policy prohibiting or unduly restricting the legitimate use of inline skate prostheses or other assistive devices.

• Require ongoing compliance monitoring, reporting, and potential sanctions if United fails to adhere to this order.

7.6. Attorneys' Fees and Costs

• Although Mr. Wilkes proceeds pro se, he reserves the right to seek attorneys' fees and costs should he retain counsel or otherwise be entitled to them under the ADA or any other statutory authority.

8. CONCLUSION AND VERIFICATION

8.1 Conclusion

• United Airlines' conduct, both historically (in 2011) and presently (in 2025), constitutes systemic discrimination under the ACAA and the ADA. Mr. Wilkes's inline skates are medically recognized as a prosthetic-like device, and the airline's arbitrary refusal to accommodate has caused profound harm, thwarted his independence and causing severe emotional distress.

8.2 Verification

• I, the undersigned Plaintiff, verify under penalty of perjury that the statements made in this Complaint are true and correct to the best of my knowledge, information, and belief.

**DATED** this ___ day of _____, 2025.

**Michael "Troy" Wilkes**
Plaintiff in Pro Se

HANDICAPSKATER ACAA ACCESSIBILITY COMPLAINT
10

EXHIBIT R (HSK-SYS-0066—0068)

Biomechanical Addendum – Medical Necessity of Skates as a Prosthetic Mobility Aid

This scientific addendum to clarify the biomechanical necessity of using skates as a non-traditional prosthetic mobility aid. It is submitted to assist the Court in understanding the medical and physiological foundation for my ADA accommodation request.

ADDENDUM: Biomechanical Justification for Skates as a Mobility Aid

## ✹ Purpose of this Addendum

This addendum provides biomechanical and physiological justification for my ADA accommodation request and fee waiver. It explains why **walking is medically hazardous** for my condition and why **inline skating serves as a prosthetic substitute** that restores mobility without pain or injury.

## ☁ SI Joint and Hip Compression During Walking

Walking, often perceived as benign, imposes significant compressive and torsional forces on the pelvis — particularly the **sacroiliac (SI) joints**. These joints serve as shock absorbers between the spine and hips but are especially vulnerable when soft tissue integrity has been compromised by trauma.

**Key Load Dynamics:**

| Gait Phase | Compression Force on Hip Joint | Source |
|------------|-------------------------------|--------|
| Normal Walking | ~3× Body Weight (BW) | Nordin & Frankel, p. 213 |
| Heel Strike | ~4× BW | Hamill & Knutzen, p. 182 |
| Toe-Off | ~7× BW | Norkin & Levangie, p. 326 |

At **heel strike**, the body absorbs downward impact due to gravity. At **toe-off**, the body launches forward, and the pelvic torque transmits up to **7× BW** through the hip joints — a critical biomechanical stressor in cases like mine.

## ▣ Pain-Induced Cardiovascular Escalation (PICE)

**PICE** refers to the elevation of heart rate and loss of autonomic regulation resulting from prolonged, chronic pain exposure. It is **not a function of exertion** but a **cardiovascular and autonomic response to unresolved pain**, especially structural pain from gait-induced trauma.

**In my case:**

- ☐ **Walking or standing for extended periods** triggers SI compression → pain → **tachycardia** and reduced **heart rate variability (HRV).**
- ☐ This is measured using biometric data from **wearables** over the past five years.
- ☐ In contrast, **skating lowers HR and increases HRV,** even over long distances.

Walking isn't just painful — it's medically destabilizing. Skating mitigates PICE and restores autonomic equilibrium.

[1] Nordin, M. and Frankel, V.H., 2001. **Basic Biomechanics of the Musculoskeletal System**. 3rd ed. Baltimore: Lippincott Williams & Wilkins.
[2] Hamill, J. and Knutzen, K. M., 2003. **Biomechanical Basis of Human Movement**. Baltimore: Lippincott Williams & Wilkins.
[3] Norkin, C.C. and Levangie, P.K., 1992. **Joint Structure and Function: A Comprehensive Analysis**. 2nd ed. Philadelphia: F A Davis Co.

### 🛼 Skating as a Functional Prosthetic

Inline skating offers:

- Smooth, gliding gait cycle
- Minimal vertical oscillation
- **Ground reaction forces <0.3× BW**
- No heel strike or ballistic phase

This reduces SI and hip joint load **by more than 90%,** prevents PICE, and allows functional mobility.

### 🦪 My Scientific Studies (2005–2025)

Over the last two decades, I have:

- Collected HR, HRV, and gait data from thousands of hours of skating vs walking
- Demonstrated in legal, biomechanical, and medical settings that:
  - **Walking exacerbates pain and cardiovascular stress**
  - **Skating lowers exertion and enables long-distance mobility**
- Built data science models (e.g. deep learning, SHAP analysis) that achieve **100% accuracy** distinguishing walking from skating based on biometric load
- Authored legal pleadings and scientific treatises (HandicapSkater.com) documenting my findings
- Earned DMV and DOT approval for skating use in transit and driving

### 📊 Updated Scientific Summary

| Gait Mode | Impact Force | Pain/Failure Risk | Cardiovascular Response |
|-----------|--------------|-------------------|-------------------------|
| Walking (level) | 3–7× BW | High | Elevated (PICE onset) |
| Walking (stairs) | Up to 7× BW or more | Severe | Critical for SI trauma |
| Skating | 0.2–0.3× BW | Minimal | Stabilized, safe HRV |

### ⚠ Structural Limits

- Hip joint structural breakdown begins at **12–15× BW** (Hamill & Knutzen, p. 182)
- My body experiences **7× BW loads during walking,** with only a **5× margin** before failure
- Engineers design load-bearing systems with **5–10× safety margins** — walking violates this

### 📑 Legal and Medical Recognition of My Mobility Aid

- **DOT-FTA 2007**: Ordered SamTrans to accommodate my skates under ADA Title II
- **SamTrans ParaTransit**: Recognized disability and approved skate use after 2007 ruling
- **DMV 2022–23**: Validated my ability to operate vehicles while wearing skates
- **Medical records and biometric analysis** confirm PICE and post-traumatic sensitivity to ground impact

---

### ✅ Conclusion

Inline skates are not a luxury or hobby. They are **a prosthetic mechanism** for preserving function, preventing medical harm, and restoring autonomy. Walking with my condition is equivalent to sending uncontrolled forces through damaged bone — no physician would recommend it. I respectfully request that this biomechanical evidence be considered alongside my ADA and fee waiver request.

I respectfully request the Court to consider this biomechanical evidence as part of my declaration in support of ADA accommodation.


Respectfully,

/s/ Troy Wilkes

Michael Troy Wilkes

JS 44 (Rev. 10/20)                    CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)

I. (a) PLAINTIFFS:

Michael Troy Wilkes

(b) County of Residence of First Listed Plaintiff: San Mateo County

(c) Attorneys (Firm Name, Address, and Telephone Number):
Pro Se Plaintiff
HandicapSkater.com (Disability Advocacy)
2201 Bridgepointe Pkwy, C246
Foster City, CA 94404
(650) 678-0502
handicapskater@mindspring.com

DEFENDANTS:

RediWheels; BART; CalTrain; SamTrans; US DOT; San Mateo County Superior Court; San Mateo County Event Center; United Airlines; Delta Airlines; Airbnb, Inc.; US Bank; and DOES 1–50

(b) County of Residence of First Listed Defendant: San Mateo County (EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorneys (If Known): Unknown

II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

[X] 3 Federal Question (U.S. Government Not a Party)

III. CITIZENSHIP OF PRINCIPAL PARTIES

Plaintiff: [X] 1 Citizen of This State

Defendant: [X] 1 Citizen of This State

IV. NATURE OF SUIT (Place an "X" in One Box Only)

[X] 446 Americans w/Disabilities – Other

V. ORIGIN

[X] 1 Original Proceeding

VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing: 42 U.S.C. § 12101 et seq. (ADA); 42 U.S.C. § 3601 et seq. (housing); 49 U.S.C. § 41705 (aviation); 42 U.S.C. § 1983 (deprivation); Rehabilitation Act; Unruh Civil Rights Act

Brief description of cause: Systemic discrimination against Plaintiff for use of medically necessary prosthetic inline skates, violating ADA Title I-III, Title V retaliation, the Fair Housing Act, the Air Carrier Act, and Section 504 of the Rehabilitation Act.

VII. REQUESTED IN COMPLAINT:

[] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND: Injunctive relief and damages exceeding $250,000, including compensatory, statutory, and punitive damages.

JURY DEMAND: [X] Yes

VIII. RELATED CASE(S) IF ANY:

N/A

DATE: July 24, 2025

Signature of Attorney of Record:

/s/ Michael Troy Wilkes

Pro Se Plaintiff